UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
                                       :

RHULAND DAVIS,
                      Plaintiff,       :

                                        :       1:21-cv-00387 (ER) (BCM)
      - against -               :

                                        :       **SECOND AMENDED**
METRO NORTH COMMUTER RAILROAD,   :       **COMPLAINT**
ANDREW PAUL, and JOHN LONGOBARDI, :

                                        :
                      Defendants.     :
----------------------------------------------------------------x

## PRELIMINARY STATEMENT

1. Plaintiff Rhuland Davis ("Mr. Davis"), brings this action for race discrimination, retaliation, and constitutional violations against former employer Metro North Commuter Railroad ("Metro North") and individual defendants Andrew Paul and John Longbardi, in their official and personal capacities, for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1983. In accordance with Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial of this action.

2. Mr. Davis was employed for twenty-five years, including twenty in train service with Metro North at the time of his first disciplinary incident in 2016. On June 24, 2016, Mr. Davis was notified to attend an investigation relating to a work assignment from June 20, 2016. He was assigned a Flag Assignment that day to provide safety coverage for contractors performing work on the train tracks at Harmon Station. When Mr. Davis found the contractors, they told him they finished working for, and were not working on the platform for that day. Mr. Davis notified his crew dispatcher that he completed the job assignment and his crew dispatcher cleared him to work another shift later that evening. After a formal investigation and hearing, Mr. Davis was found guilty of committing acts of moral turpitude: dishonesty and submitting false payroll records,

and terminated from Metro North, effective November 10, 2016. After ACRE Local 1 appealed

the decision, his dismissal was reduced to a sixty-one day suspension, and he was put on a "last

chance" disciplinary waiver despite no admission of guilt to the charged offenses.

3. On July 12, 2018, while working as a Conductor, Mr. Davis was involved in a train

collision, and after a formal investigation and hearing, he was terminated. Pursuant to his "last

chance" waiver, he was terminated effective October 9, 2018.

4. On behalf of Mr. Davis, ACRE Local 1 appealed both decisions to the Special Board

of Adjustment for arbitration proceedings on grounds that his suspension and termination were

arbitrary, capricious and excessive. Specifically, relating to the 2016 incident, Local 1 argued

that Metro North improperly admitted a video into evidence, failed to get a written statement

from Mr. Davis during the investigation, and failed to provide probative evidence that Mr. Davis

left the contractors before they finished working, or that he submitted false payroll records. Local

1 argued that as a result of these fatal procedural errors, Mr. Davis was denied a fair and

impartial trial.

5.   On May 1, 2017, Mr. Davis filed a discrimination complaint with NYSHRL

alleging that Metro North engaged in unlawful discrimination against him on the basis of race when

they terminated/suspended him in 2016. On October 8, 2019, Mr. Davis filed a second dual

NYSHRL and EEOC complaint—again alleging that Metro-North engaged in unlawful

discrimination against him on the basis of race when they terminated him in 2018. The New York

Division of Human Rights investigated both complaints and issued two separate orders

determining that there was no probable cause to believe Metro North engaged in unlawful

discrimination against Mr. Davis. Mr. Davis was not afforded a hearing by the NYDHR during the

investigation of both his 2017 and 2019 discrimination complaints.

6. Mr. Davis received a right-to-sue letter from the EEOC in connection with his October 8, 2019 charge of discrimination dated October 13, 2020.

7. On December 10, 2019, over a year after Plaintiff's termination, the arbitrator issued two awards upholding the 2016 suspension and 2018 termination. He determined that Mr. Davis's actions in 2016 supported Metro North's decision to terminate. And in the 2018 award, the arbitrator concluded that despite the engineer taking sole responsibility for the train collision, because of Mr. Davis's previous suspension and last chance waiver, even the most minor disciplinary infraction associated with the train collision supported job termination.

## FACTUAL ALLEGATIONS

8. Plaintiff is fifty-one years old and identifies as an African-American male.

9. Plaintiff began working for Metro North Commuter Railroad ("Metro North") on or about September 23, 1991, as a Coach Cleaner.  Plaintiff later transitioned to a Carman Helper and in January 1993, he became an Electrician.

10. Plaintiff began working as a Train Conductor on June 10, 1996 and held that position for 22 years until his termination from Metro North on October 9, 2018. As a Train Conductor, Plaintiff worked on passenger trains as well as in combination service which consists of flagging for outside contractors, work trains and yard jobs.

11. Plaintiff was a union member and his hours of service, working conditions, and rates of pay were governed by a Collective Bargaining Agreement between Metro North and his union, the Association of Commuter Rail Employees, Local 1.

12. For the duration of his employment at Metro North, Plaintiff performed his job satisfactorily in the positions he held.  Plaintiff maintained a great track record of experience, attendance and willingness to work. With the exception of the 2016 and 2018

incidents, Plaintiff did not have any history of disciplinary infractions for the duration of his employment at Metro North.

13. On July 12, 2018, plaintiff was working Job A-140 on the New Haven line. He was assigned to the AM Protect ("AMMO") crew, with a brakeman and engineer, to stay on standby during the morning rush hour to protect the main line track in case a train breaks down and needs to be towed off the track. After the morning rush hour, the AMMO crew stopped at a freight yard to pick up six additional freight cars before going up the New Haven line towards the Waterbury line.

14. Just before the AMMO train reached Bridgeport station, it reduced to operating on "restricted speed". "Restricted speed" protocol has two components. It requires the engineer to operate the train at a speed of 15 mph or less. It also requires the engineer to operate the train at a speed allowing it to stop short of another train, signal, derail, improper lined switch, or obstacle within one-half the range of the engineer's vision.

15. In the engine cab, Mr. Davis and the brakeman occupied the "fireman's" side of the cab, opposite the engine control side where the engineer sat. The AMMO train was operating in the long nose forward position, meaning the engine was directly in front of the engine cab.

16. The AMMO train approached a curve bend in the track. But because Mr. Davis was on the "fireman's" side of the cab following the outside curvature of the track, his line of sight was completely obstructed by the engine, and he temporarily lost sight of what was ahead on the track. The engineer's side of the cab, however, followed the inside curvature of the track, and he maintained his full field of vision of the track ahead.

17. Prior to approaching the curve bend, the engineer saw another train ("Train 1924") some distance ahead, but at that point, was unable to discern whether the train was on a parallel track or the same track as the AMMO train. As their engine car took the curve bend, he realized the other train was on the same track and immediately applied the emergency brakes to avoid hitting it. The train was travelling at below restricted speed—at approximately 13 mph— when the engineer applied the emergency brake.

18. Because Mr. Davis's line of sight was obstructed, he did not know what caused the engineer to apply the emergency brake. Approximately a second before contact, Mr. Davis saw Train 1924 as their engine car collided with it. As a result of the collision, the knuckles of the two trains became hitched together.

19. A crewmember of Train 1924 immediately made an emergency call to District F Rail Traffic Control ("RTC"). As he exited the engine compartment, Mr. Davis heard RTC over his handheld radio initiate the emergency call protocol.

20. Mr. Davis saw that their engine car and Train 1924 were hitched to each other, and based on his experience as Conductor, he concluded the trains need to be unhitched and immediately went down to the track to physically detach the connected knuckles of his engine car from Train 1924.

21. Mr. Davis was taken out of service effective immediately, and about a week later received a notice of disciplinary hearing from Metro North outlining his charged offenses: failure to take appropriate action to stop the train within one-half the range of vision (restricted speed protocol) of Train 1924, failure to call in the incident to RTC, failure to carry his Conductor license, and performance of an unauthorized reverse move.

22. His disciplinary trial was held on two dates; the first on September 5, 2018, and then second on September 19, 2018. At trial Mr. Davis testified to the following:

    a) The train was operating below restricted speed limit of 15mph and that he didn't see Train 1924 until a second before their engine car hit it, and therefore he had no range of vision to communicate to the engineer that there was another train within one-half his range of vision.

    b) The emergency protocol was immediately initiated by District F RTC, so there was nothing for him to call in.

    c) His certificate fell out of his pocket earlier in the day, and at the time of the incident he was unaware that it was not on his person. He found his certificate the same day and notified his manager. And although he didn't have his certificate on him at the time of the accident, he was authorized and certified to perform his duties as Conductor of the train.

    d) He did not perform a reverse move by unhitching the knuckles of the train cars. In his twenty years of experience, unhitching two trains was never considered a reverse move that needed prior authorization from RTC.

23. On information and belief, at the trial, Mr. Steve DePalma, Assistant Director of Conductor Compliance of the New Haven line, testified that based on the video evidence, the emergency brakes were applied in accordance with protocol, but that Mr. Davis had no way of knowing at what point the emergency brakes were applied. He testified that Mr. Davis had a blind spot because of where he was sitting in the operating cab and that the engineer had the better line of sight based on the curvature of the track.

24. Metro North did not afford Mr. Davis pretrial proceedings, or a pretrial settlement offer. The engineer of the AMMO train took full responsibility for the collision, and both he and the brakeman were offered pretrial settlement agreements, whereas Mr. Davis was not. And pursuant to the rules of Metro North's collective bargaining agreement with ACRE Local 1, Metro North failed to follow appropriate pretrial procedures.

25. Metro North Defendant, Andrew Paul communicated to the union that he intended to fire Plaintiff before the investigation was conducted. Plaintiff's union representative was also informed by Defendant John Longobardi that he was forced to sign plaintiff's dismissal letter.

26. On information and belief, both ACRE Local 1 and Metro North have since decided not to use the arbitrator due to his delay in decision making.  The arbitrator was over 90 years old, mentally infirm, and incapable of performing the duties of his position.

**DEFENDANTS' DETERMINATION TO FIRE MR. DAVIS AND MAKE
AN EXAMPLE OUT OF HIM BEFORE ANY INVESTIGATION WAS
CONDUCTED AND THE FACTS WERE ESTABLISHED, IN FLAGRANT
VIOLATION OF THE COLLECTIVE BARGAINING AGREEMENT AND
OTHER POLICIES, PROCEDURES, AND DUE PROCESS**

27. On July 12, 2018, within hours of the train collision referenced above, Kevin O'Connor, a management-level employee in Crew Management, posted a message on Metro North's online system that would appear on every Metro North employee's computer screen when they logged into the system. The message blasted the train collision, asserting that Metro North was lucky that the train was not carrying passengers and that no one was seriously injured, and claiming that the accident was "100% preventable if the crew was operating as required by restricted speed".

28. The message continued: "the key element of restricted speed is 'prepared to stop within one half the range of vision'. The speed is the least of the requirement, it should be based on how long it will take you to stop; if that is 10 MPH then operate at that speed; if 4 MPH then that is what is required." The message instructed employees to discuss this in weekly meetings, and ended with the statement that "luck wont [sic] last forever."

29. At the time of this message, an investigation of the collision had yet to be conducted, and Kevin O'Connor and Metro North management had no idea if the train Mr. Davis was

stationed on had been traveling too fast to be "prepared to stop within one half the range of vision" or if the collision was "100% preventable if the crew was operating as required by restricted speed". Kevin O'Connor and Metro North management posted this message in order to assign blame for the collision on Mr. Davis as the conductor of the moving train, despite not knowing what had caused the collision or whether the train had been traveling faster than the "one half range of vision" standard articulated above. At the time of this missive, Kevin O'Connor and Metro North management did not know if the collision had been caused by the train Mr. Davis was the conductor of going too fast, rather than any other reason, i.e. that the train that was crashed-into was on the wrong track, a mechanical failure, the engineer having a medical incident, or an entire universe of possible reasons

30. Understandably incensed that Metro North management had decided to publicly blast Mr. Davis for the train collision despite that an investigation had yet to be conducted, Mr. Davis messaged Ralph Sanziri, a conductor and Chairman of ACRE Division 1, notifying him of this public flogging. Upon viewing the posting, Mr. Sanziri replied: "unbelievable". Mr. Davis responded: "I feel like that's a personal shot". Mr. Sanziri replied: "It's premature and completely unprofessional", and stated he would try to get the message taken down.

31. Dennis Richardson, a Metro North conductor and a hearing officer for ACRE, wrote to Mr. Davis that the day of the collision, Metro North Vice President Andrew Paul announced to Ralph Sanziri and Mr. Richardson that Metro North would be firing Mr. Davis. Mr. Richardson continued: "This was before the facts were known and before the investigation. They did not treat you the same as the other employees involved or as they treat any employee. They prejudged you and never offered a settlement as they did in other cases." Defendants' decision to fire Mr. Davis the day of the collision, before the investigation was conducted and the facts were

known, while openly announcing their decision as a fait accompli, constitutes evidence of Defendants' malicious and bad-faith intent to injure Mr. Davis.

32. The Collective Bargaining Agreement ("CBA") between Metro North and Mr. Davis's union requires that the investigation be scheduled within seven days when the employee receives notice of the investigation.

33. Mr. Davis received notice of the investigation on July 19, 2018, but the investigation was not actually scheduled and conducted until September 5, 2018, in violation of the CBA.

34. Defendants unlawfully delayed the investigation in order to develop the evidence and rationale to fire Mr. Davis. Indeed, when Kevin Haynes, the union representative for Metro North conductors learned that the investigation had not been conducted within seven days of the notice, he wrote to Mr. Davis: "Heard they didn't have your investigation. They want to get you".

35. When the investigation was finally conducted, Metro North proceeded in a adversarial fashion, converting the investigation into a prosecution, in furtherance of the fait accompli determination to fire Mr. Davis.

36. Between Mr. Davis's suspension on July 12, 2018 and the first day of the "investigation" on September 5, 2018, Mr. Davis went on a vacation, and posted pictures of himself on a boat on social media.

37. Defendants – evidently monitoring Mr. Davis's social media in furtherance of their scheme to fire him – caught wind of the boating posts, and told Mr. Davis's union that they considered his vacation and posting on social media a "huge middle finger" to them.

38. The CBA requires that "Immediately preceding a scheduled investigation, the Union and Metro-North representatives will meet for the purpose of attempting to resolve the matter." The CBA makes clear that this pre-investigation meeting is mandatory.

39. While the letter notifying Mr. Davis of the investigation ostensibly scheduled such a pre-investigation conciliation meeting, it was immediately and unilaterally cancelled by Metro North. Metro North informed Mr. Davis's union that the reason they were cancelling the pre-investigation meeting and were refusing to hold it is because they had decided to fire Mr. Davis. This was, of course, before the investigation was actually-conducted and Metro North was in possession of the underlying facts.

40. Defendants refused to hold the mandatory pre-investigation conciliation meeting and did not make any settlement offer to Mr. Davis before the investigation was conducted in September 2018. At the same time, the two other employees assigned to the same train were afforded pre-trial conciliation meetings and settlement offers. This includes the engineer of the train, Craig Davis, who took full responsibility for causing the collision.

41. Defendants evidently held the pre-trial conciliation meeting with Craig Davis very shortly after the collision and long before the investigation, and offered Mr. Davis a settlement involving suspension from duty. Mr. Davis accepted the settlement and served the entirety of his suspension before the investigation was even conducted,

42. Upon information and belief, Defendants also held a pre-investigation conciliation meeting with the third employee assigned to the train in question shortly after the collision and long before the investigation, and offered that employee a settlement that did not involve termination, which the employee accepted.

43. With Mr. Davis, on the other hand, Defendants refused to hold the mandatory pre-investigation conciliation meeting at all, and refused to discuss settlement. By the time the investigation was conducted, Defendants had already settled with the other two employees on the train in question while refusing to engage in settlement talks with Mr. Davis. Accordingly, by the time the "investigation" was conducted, it was no longer an investigation of the underlying incident, but a prosecution of Mr. Davis, the only remaining employee who had been assigned to the train in question on the day of the incident.

44. Mr. Davis was never actually offered a settlement or waiver in connection with the July 12, 2018 incident, unlike the other two employees on the train in question, including the engineer who took full responsibility for the collision.

45. At Metro North, settlements and waiver offers are made formally in writing.  While the other two employees on the train in question were provided with formal settlement offers in writing (and long before the investigation was conducted), Mr. Davis was never provided with an actual settlement offer, not to mention formally and in writing.

46. After the investigation was conducted, Mr. Davis's union representative informed him that they had heard Defendants were going to fire Mr. Davis unless he admitted guilt and forfeited any right to appeal. Mr. Davis's union representative granted Defendants an extension on their time to make a decision as to Mr. Davis's fate, and sought to meet with Defendants' President to see if there was a deal to be made. While Mr. Davis maintained his innocence and did not want to sign an admission of guilt, the settlement/waiver never actually materialized, and Defendants never actually made a settlement/waiver offer to Mr. Davis. It does not appear that Mr. Davis's union representative was ever actually able to meet with Defendants' President to discuss a deal post-investigation, and that the union representative's understanding of what

actions Defendants were going to take absent an admission of guilt and forfeiture of a right were merely second-hand musings from an unidentified employee who did not possess the authority to actually enter into a settlement agreement or offer a waiver.

### COMPARATORS

47. On information and belief, another similarly situated white employee, Danielle Bonge, has been found guilty of similar charges, signed last chance waivers, violated those waivers and remained employed by Metro North.

48. On information and belief, on December 17, 2014, an engine ran a signal in grand central, and collided with a passenger train with passengers aboard. Defendants consider a collision with a passenger train with passengers on board a more severe incident than a collision with a non-passenger train and/or a collision with a train with no passengers on board. Engineer Danielle Bonge had the line of vision to see the passenger train ahead.  She received her second last chance waiver for this incident. Danielle Bonge had a previous disciplinary case where she received her first last chance waiver, and, on information and belief, while she was on probation, she was caught cheating on a test while in engineer training school. On information and belief, she was criminally charged for her involvement in the cheating scandal.  Though she had a last chance waiver she remained employed. On a separate occasion, Danielle had another case where she was recorded leaving the cab of a passenger train she was operating to curse at a passenger on the train. On information and belief, after two last chance waivers Danielle remains employed today.

49. While Danielle Bonge was offered a *second* last chance waiver despite being the engineer who caused a train collision with passengers on board, Mr. Davis was not offered a second last chance waiver for the 2018 incident, and was fired instead. Danielle Bonge and Mr. Davis are similarly situated in that they were both on last chance waivers while assigned to a train that was

involved in a collision but whereas Danielle Bonge was offered yet another last chance waiver – upon information and belief, pre-investigation – Mr. Davis was not actually offered another last chance waiver, and was instead fired.

50. Indeed, Danielle Bonge was provided with a third last chance waiver after the incident relayed above. Accordingly, Danielle Bonge is similarly-situated to Mr. Davis in that, upon information and belief, Defendants never *sought* to fire Danielle Bonge despite that she was on multiple last chance waivers, while justifying Mr. Davis's termination with the rationale that *any* violation of rules or procedures compelled Mr. Davis's termination because he was already on a last chance waiver, which was the winning argument with the arbitrator who upheld Mr. Davis's termination by eliding over the facts of the underlying incident and adopting Defendant' argument that because Mr. Davis's did not have his conductor card on his person at the time of the incident, that alone justified his termination.

51. On information and belief, in the same incident another similarly situated white employee, Dan Magro, received no discipline at all, and remained employed by Metro North. Dan Magro was a Conductor and held the same position as Plaintiff. On December 17, 2014 Dan was the conductor in charge of the train, and like plaintiff was unable to see through the eyes of his engineer or brakeman. Defendants did not seek to discipline Dan Magro for the incident, and accordingly, he was not required to sign a last chance waiver, admit guilt, or enter into a settlement agreement in order to keep his job or avoid other discipline.

52. In the same incident, Dan Hannon was the brakeman. He was in the same position on the engine as Plaintiff's brakeman.  Dan Hannon was not fired for this incident.

53. On information and belief, Plaintiff is also aware of several white

employees on last chance waivers for other disciplinary charges that remained employed by Metro North.

54. On information and belief, employee Tom Dunne, a conductor, received a last chance waiver for being arrested while on duty for stealing from Rite Aide.  He later received another last chance waiver after being caught on camera making a reverse move in north White Plains, with a conductor on the controlling end of the movement rather than an engineer, who is actually authorized to make such a movement. Upon information and belief, Defendants consider the reverse move Tom Dunne conducted a violation of the same greater severity as the allegedly unauthorized reverse move Mr. Davis conducted that Defendants charged Mr. Davis with, but offered Mr. Dunne another last chance waiver while seeking Mr. Davis's termination for the same conduct.

55. On information and belief, employee Michael Duffy violated a last chance-waiver due to testing positive for an illegal substance and was brought back to work. Defendants consider the presence of an illegal substance in an employee's blood an offense as or more severe than operating a train too fast or failing to prevent a collision because intoxication on illegal substances while operating a train is knowingly and intentionally reckless.

56. On information and belief, employee Devin Scalibrini also violated a last chance waiver due to testing positive for an illegal substance and was brought back to work.

57.  On information and belief, employee Brian Golden violated a last chance waiver for cash remittance and was brought back to work.

58. On information and belief, several employees that pleaded guilty to criminal charges for activities *on Metro North property* were returned to work instead of fired. Sone of the

employees are John Twardy (nephew of superintendent Thomas O'Connor), Joe Fowler,  Omar Carrillo, and others.

59. On information and belief, Defendants consider committing a crime on Defendants' property of violation of the same or greater severity as the charges brought against Plaintiff.

**First Cause of Action:**
**Title VII**

60. Plaintiff repeats and realleges the allegations contained in paragraphs 1-59 inclusive as if they were fully set forth herein.

61. The aforesaid actions of Metro North constitute a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*.

62. As a result of Metro North's violation of Title VII, Plaintiff has suffered and continues to suffer economic losses such as lost wages (backpay and frontpay), dimunition of pension benefits and other economic losses, emotional distress, pain and suffering, and other compensatory damages. Plaintiff is also entitled to and demands an award of attorney's fees, costs, interest and statutory damages and/or penalties.

**Second Cause of Action:**
**Selective Enforcement**

63. Plaintiff repeats and realleges the allegations contained in paragraphs 1-59 inclusive as if they were fully set forth herein.

64. The aforesaid actions of the Defendants constitute a violation the 14th Amendment and/or 42 U.S.C. § 1983.

65. As a result of Defendants' violation, Plaintiff has suffered and continues to suffer economic losses such as lost wages (backpay and frontpay), dimunition of pension benefits and other economic losses, emotional distress, pain and suffering, and other compensatory damages. Plaintiff is also entitled to and demands an award of attorney's fees, costs, interest and statutory damages and/or penalties.

**Third Cause of Action:**
**Procedural Due Process**

66. Plaintiff repeats and realleges the allegations contained in paragraphs 1-59 inclusive as if they were fully set forth herein.

67. The aforesaid actions of the Defendants constitute a violation the 14th Amendment and/or 42 U.S.C. § 1983.

68. As a result of Defendants' violation, Plaintiff has suffered and continues to suffer economic losses such as lost wages (backpay and frontpay), dimunition of pension benefits and other economic losses, emotional distress, pain and suffering, and other compensatory damages. Plaintiff is also entitled to and demands an award of attorney's fees, costs, interest and statutory damages and/or penalties.

**<u>Punitive Damages</u>**

69. Because Defendants' actions were willful, unlawful, malicious and intentional, and/or negligent or reckless as to Plaintiff's rights, Plaintiff hereby demands punitive damages.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff Rhuland Davis prays for the following relief: Judgment against Defendant awarding damages in an amount to be determined at trial including economic damages, compensatory damages, lost wages, treble and/or liquidated damages, penalties, civil penalties, punitive damages, costs, interest, attorney's fees, and an award of such other and further relief as the Court deems just and proper.

Dated: August 19, 2022

Josh Bernstein, P.C.
*Counsel for Plaintiff*

By:_____/s/_____
Joshua Alexander Bernstein

188 Grand St., 2nd Fl.
New York, NY 10013
(646) 308-1515
jbernstein@jbernsteinpc.com
