UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RHULAND DAVIS,

                    Plaintiff,

        – against –

METRO NORTH COMMUTER
RAILROAD, ANDREW PAUL, *and*
JOHN LONGOBARDI,

                    Defendants.

**OPINION & ORDER**

21 Civ. 387 (ER)

RAMOS, D.J.:

Rhuland Davis filed this action on January 11, 2021 against Metro-North Commuter Railroad ("Metro-North") and Metro-North employees Andrew Paul and John Longobardi ("Individual Defendants") (collectively "Defendants"). Doc. 1. Davis filed a first amended complaint ("FAC") on September 29, 2021, and a second amended complaint ("SAC") on August 19, 2022. Docs. 22, 58. In the SAC, Davis asserted claims of racial discrimination in violation of Title VII of the Civil Rights Act of 1964, selective enforcement in violation of 42 U.S.C. § 1983, and procedural due process violations stemming from his termination from Metro-North in 2018. Doc. 58. In a June 20, 2023 opinion and order, this Court dismissed the SAC, and on April 25, 2024, the Second Circuit affirmed this Court's dismissal of Davis's due process claim, but vacated the Court's dismissal of the Title VII and selective enforcement claims and remanded for further proceedings. Doc. 87.

Now before the Court is Defendants' motion for summary judgment as to the remaining claims. Doc. 101. For the reasons set forth below, Defendants' motion is DENIED.

I.    **BACKGROUND**

   **A. Factual Background**[1]

   *1. Parties*

   Davis is a former Metro-North conductor whose employment was terminated on October 9, 2018.  Doc. 104-1 ¶¶ 2, 117.  Davis, who is African-American, began working at Metro-North in September 1991, and he was employed there for twenty-seven years. *Id.* ¶¶ 1, 2; Doc. 58 ¶ 9.  Beginning in June 1996, and for the next twenty-two years until his termination in 2018, he worked as a train conductor.  Doc. 104-1 ¶ 2; Doc. 58 ¶ 10. Davis' employment with Metro-North was governed by a Collective Bargaining Agreement ("CBA") between Metro-North and a union, the Association of Commuter Rail Employees, Local 1 ("ACRE"), of which he was a member.  *Id.* ¶ 3.  As discussed below, Davis was terminated after being found guilty of disciplinary charges stemming from a train collision that took place on July 12, 2018.  *Id.* ¶ 117.

   Andrew Paul was the Vice President of Labor Relations at Metro-North at the time Davis was terminated.  Doc. 103-2 at 10.  In that role, Paul was the chief negotiator for Metro-North in collective bargaining, dealt with Metro-North's unionized employees through their labor representatives, and oversaw the disciplinary process through the Department of Hearings and Investigations ("DIH").  *Id.* at 10, 11.  Davis did not have any interaction with Paul while working as a conductor, and before he was terminated, he had never met him in person.  Doc. 104-1 ¶¶ 123, 124.

   John Longobardi was the Deputy Chief Transportation Officer at Metro-North at the time Davis was terminated.  Doc. 103-10 at 12.  In that role, Longobardi oversaw the movement of the trains, the conductors, the engineers and the employees who supervised the engineers and conductors.  *Id.* at 13.  He also oversaw injury investigations and

---

[1] The following facts are taken primarily from Defendants' Local Rule 56.1 Statement, Doc. 104-1, and Davis' counterstatement thereto, Doc. 110 at ECF 22–52, as well as from exhibits that the parties have submitted on the record.  The facts recited here are undisputed unless otherwise noted.

disciplinary matters.  *Id.*  When Davis was a conductor, he did not regularly speak to Longobardi.  Doc. 104-1 ¶ 125.

Kevin O'Connor, who is not a party but was deposed in this matter, was the Chief Transportation Officer and Longobardi's supervisor.  Doc. 103-6 at 7; Doc. 103-10 at 12–13.

### 2. *Davis' Responsibilities As Conductor*

The parties dispute what Davis' core responsibilities were as a Metro-North conductor.  Defendants state that his duties "included having charge over the train and all employees working on the train, including overall responsibility for the train's compliance with all safety rules."  *Id.* ¶ 4.  Davis claims that Defendants are conflating the roles of conductor and engineer.  Doc. 110 ¶ 4.  He states that while it is true that conductors are responsible "for the prompt movement and safety of their trains," it is the engineers that "operate the trains."  *Id.*  Davis states that conductors "walk through the train and collect fares from customers, and are otherwise responsible for customer service"; they are officially classified as "Train Service Employees," and as "service workers, they are the Metro-North employees who interface with customers and the general public."  *Id.*  Davis also states that Defendants incorrectly state that conductors have "overall responsibility" for safety rules because Metro-North Railroad Operating Rule 7-B states:  "The conductor, engineer, and pilot are *equally* responsible for the safety of the train and observance of all applicable rules and special instructions."  *Id.* (emphasis added) (quoting Doc. 109-1 (Metro-North Operating Rules) at ECF 49).

Defendants state that, as a conductor, "Davis was required to report by the quickest available means of communication any accidents or any other unusual conditions that might affect the movement of trains or the safety of employees."  Doc. 104-1 ¶ 5.  Davis neither admits nor denies that statement, but states that conductors and other Metro-North employees "are not supposed to interrupt the report of an accident or other unusual conditions by other employees."  Doc. 110 ¶ 5.  Davis likewise states in his

declaration: "Once an emergency call goes out over the radio, all radio traffic is to cease so that [Rail Traffic Control ("RTC")] can coordinate a response." Doc. 109-3 ¶ 20. As discussed below, Davis claims that he did not report the train collision at issue here himself because another employee on his train, Craig Davis, the engineer, "had already reported the deployment of the emergency brakes," and Davis also "overheard the crew of the train [they] collided with calling the incident in." *Id.*

### 3. *Davis' 2016 Incident*

On June 20, 2016, approximately two years before the train collision at issue in the instant case, Davis was working as a "conductor flag" tasked with protecting contractors working on Metro-North tracks, including by warning them of approaching equipment. Doc. 104-1 ¶ 6. Four days later, on June 24, he was charged with committing various rule violations on June 20, including: failing to deliver a mandatory safety briefing to the contractors, leaving his assignment without permission before the contractors had completed their work, and inaccurately recording his work time, which allegedly resulted in overpayment of wages. *Id.* ¶ 7.

On August 25, 2016, Metro-North dismissed Davis from his job. *See* Doc. 103-3. However, it offered Davis a chance to return to work if he admitted guilt to the disciplinary charges, waived his appeals, and served a suspension; Davis declined, believing in his innocence. Doc. 104-1 ¶¶ 8, 10. The offer to resolve his disciplinary charges was not communicated in writing. *Id.* ¶ 9.

On November 28, 2016, pursuant to the CBA, a disciplinary hearing was held for the events of June 20. *Id.* ¶ 11; *see also* Doc. 103-3. Davis was found guilty of the charges and terminated, effective August 25, 2016. Doc. 104-1 ¶ 12. Davis appealed the decision. *Id*. ¶ 13. As a result of the appeal, Metro-North's Labor Relations Department converted his termination to a 61-day suspension. *Id.*; *see also* Doc. 103-3. In a December 5, 2016 letter to Davis' union representative communicating the 61-day

suspension, a representative from Metro-North's Labor Relations Department stated that "any future disciplinary issue will likely cause [Davis] to be terminated."  Doc. 103-3.

On January 17, 2017, Davis returned to work from his disciplinary suspension under "last chance" discipline.  *Id.* ¶¶ 15, 16.  Defendants explained in a prior motion that returning to work on a "last chance" basis meant "any further discipline would be grounds for termination."  Doc. 25 at 1.  Generally, the sooner a "last chance" employee incurs new disciplinary charges, the more likely it is that those charges will lead to termination.  Doc. 104-1 ¶ 19.

Davis appealed the discipline for the events of June 20, 2016 to the National Mediation Board's Special Board of Adjustment No. 1182.  *Id.* ¶ 17.  In a November 18, 2019 Award, the neutral arbitrator for the Special Board of Adjustment No. 1182 determined that Davis' June 20, 2016 misconduct "would support job termination"; however, because Metro-North had already reduced Davis' penalty to a 61-day suspension, the arbitrator accepted that penalty.  *Id.* ¶ 18.

### 4.  *The Train Collision*

On July 12, 2018, at approximately 1:01 p.m., Davis was involved in a train collision while working as a conductor.  *Id.* ¶ 20.  Craig Davis—who is not related to Davis[2]—was the engineer on Davis' train, and Cesar Santana was the assistant conductor, or brakeman.  *Id.* ¶¶ 21, 23.  Craig is Black, and Santana is Hispanic.  *Id.* ¶¶ 22, 24.  Before and during the collision, Davis was seated in the operating cab, along with Craig and Santana.  *Id.* ¶ 25; Doc. 103-1 at 42.  The train they were on, referred to as the "AMMO Train with Engine 104," was an engine towing six freight cars.  Doc. 103-34 at 42.  Davis did not have his conductor certificate—also referred to as a conductor card—on his person at the time of the collision.[3]  Doc. 109-8; Doc. 110 at 5.

---

[2] For clarity, the Court refers to Craig Davis by his first name, Craig, throughout the opinion.

[3] This is a violation of Metro-North operating rule 1-G(7)(b), which states that conductors "must carry a valid certificate issued by [Metro-North]" while on duty.  Doc. 109-1 at ECF 30.

Shortly before the collision, the crew on the AMMO train was instructed to operate at restricted speed, suggesting that it may be required to stop soon.  Doc. 104-1 ¶ 26.  Operating at restricted speed requires a train to travel at a speed of no more than 15 miles per hour, and slowly enough to be able to stop within half the range of the operator's vision.  *Id.* ¶ 27.  This means that even if a train is traveling below 15 miles per hour, it may not be operating at restricted speed if it cannot stop within half the range of the operator's vision.  *Id.*  Davis attests in his declaration that the engineer, not the conductor, is the employee who "actually controls and *operates* the train."  Doc. 109-3 ¶ 6 (emphasis added).  He also states that his train was traveling below restricted speed before the collision.  Doc. 110 ¶ 27.  Likewise, Metro-North's incident report concerning the July 12 incident states that the train had a "[s]peed of approximately 13.7 mph at time of EB[4] application."  Doc. 103-19 at 2 (the "Incident Report").

As Davis' train came around a curve, Craig applied the train's emergency brakes, but the train slid until it made contact with another train—Train 1924—that was ahead of it on the same track.  Doc. 104-1 ¶ 29.  Defendants claim that, immediately prior to the collision, Davis could have instructed Craig, the engineer, to slow down or stop the train.  *Id.* ¶ 28.  Davis, on the other hand, states that he could not have done so because he was sitting on the "fireman's" side of the cabin—opposite the control side where Craig, the engineer, sat—and therefore he was unable to see the approaching train.  Doc. 110 ¶ 28.  In his declaration, Davis states:  "the [e]ngineer [Craig] had full view of the track ahead, but I had no line of sight because I was on the fireman's side of the cab and the track was curved."  Doc. 109-3 ¶ 11.  As discussed below, Craig later testified in Davis' disciplinary hearing that he was the only one in the cabin with a line of vision, whereas Davis was "on the blind side," and he opined that Davis could not have intervened to prevent the collision.  Doc. 103-34 at 22.

---

[4] The Court presumes that "EB" stands for "emergency brakes."

At his deposition, O'Connor testified that, in situations where a Metro-North train is involved in a collision, if the engineer had a clear line of sight of what was ahead on the track, then the engineer is primarily responsible for the collision.  Doc. 103-6 at 21. Then, when asked whether, in that situation, the conductor would also be culpable for failing to prevent the engineer from operating at excessive speed, O'Connor responded: "Yes.  That person being the person basically in charge of the train."  *Id.*  O'Connor was then asked whether a conductor would still be culpable for a collision if they were "somewhere on a train where they themselves cannot see what's ahead on the track."  *Id.* at 22.  O'Connor stated the conductor would still be culpable if they are on the "leading end of the movement," that is, "in the cab with the [e]ngineer."  *Id.* at 23.[5]  The deposition continued as follows:

> Q:  Okay.  If they're on the Fireman's side, then they are not culpable in that situation?
>
> A:  They're still in the cab.  So I would say they're still culpable.
>
> Q:  Even though they have no line of sight?
>
> A:  They have line of sight of the curvature and whether or not the train is exceeding a speed where they would be able to stop within half the range of vision.
>
> Q:  But in that situation, don't they not have a line of sight of what's after the curve?  How would they know what speed the train needs to go if they can't see what's ahead of the train?
>
> [ . . . ]
>
> A:  Okay.  If you're on the leading end, even if you're on the Fireman's side and you're on the curvature you can tell by the speed of the train that that Engineer would not be able to stop within half the range of vision. They're also qualified on physical characteristics, they know where they are.
>
> Q:  But half the range of vision of what?  What are they supposed to be able to stop within half a range of vision or one-half a range of vision of?
>
> A:  Of anything, a switch, train, anything that's in front of them.

---

[5] The parties do not dispute that a Metro-North conductor stationed at the back of a train would not be expected to call out signals to the engineer operating the train.  Doc. 104-1 ¶ 133 (emphasis added).

Q: Anything that's on the track, in other words?

A: Correct.

*Id.* at 23–24.

Following the collision, Davis exited his train and separated—or "uncoupled"—it from Train 1924. Doc. 104-1 ¶¶ 30, 31.[6] Defendants claim that Davis had not been trained or instructed to do so. *Id.* ¶ 32. Davis responds that while he was not explicitly trained or instructed to uncouple the trains, "train crews are required to exercise sound judgement and remedy problems in the field." Doc. 110 ¶ 32.[7] At his deposition, Davis explained his decision to uncouple the trains as follows: "The two knuckles had coupled, and I don't know whether the train was about to leave, so I uncoupled, unhitched it." Doc. 103-1 at 48. When asked, "What was the purpose of doing that?" Davis responded, "That was just my first response. I didn't know whether that train was about to move. It didn't come across as a collision. It came across as we just coupled onto it." *Id.* Davis then explained that, based on his experience as a conductor, he knew that the trains were not supposed to be hitched together. *Id.* Davis also states in his declaration: "[M]y crew decoupled the train and moved it back a few feet because we did not know if the train we had been coupled to was about to move, and to cut away to inspect for damage." Doc. 109-3 ¶ 18. Davis was asked: "You didn't inform the [RTC] that you were uncoupling your train from the one it had collided with, right?" Doc. 103-1 at 54. He responded: "I don't believe so. You are expected to make decisions out there." *Id.*

Defendants state that Metro-North employees are not permitted to move trains backwards on the main line without permission from a Rail Traffic Controller, and

---

[6] The complaint states that, as a result of the collision, "the knuckles of the two trains became hitched together." Doc. 58 ¶ 18. Davis alleges that "based on his experience as [c]onductor, he concluded the trains need to be unhitched and immediately went down to the track to physically detach the connected knuckles of his engine car from Train 1924." *Id*. ¶ 20.

[7] When pressed about his experience in uncoupling trains, Davis testified that he while did not remember specifically how many times he had been involved in uncoupling, it had been more than ten times, in various circumstances such as in "rescuing a train," "[m]oving cars," and "dropping cars off." Doc. 103-1 at 23.

"permission is required because [c]onductors and [e]ngineers do not know whether a Rail Traffic Controller has authorized another train to be immediately behind theirs, such that a reverse move could endanger the occupants of both trains." Doc. 104-1 ¶ 33. They provide—and Davis does not dispute—that when a Metro-North Engineer is moving a train on the main line but not on the leading end of the movement, a Metro-North employee qualified on the physical characteristics of the territory must observe the leading end and communicate with the engineer to ensure that it is safe to move the train backwards. *Id.* ¶ 34. Davis attests in his declaration, however, that "decoupling hitched trains and moving the train back a few feet is not considered a 'reverse move.' It is essentially de minimis, and both train crews and mechanical crews routinely make such minor movements without getting permission from a Rail Traffic Controller."[8] Doc. 109-3 ¶ 30. Davis also testified at his deposition that, based on his experience, "making a cut"—which he uses synonymously with "uncoupling"—"was never considered a reverse movement." Doc. 103-1 at 22, 23.

Defendants state that Davis did not contact the RTC to report the collision. Doc. 104-1 ¶ 30. While Davis admits that he did not report the incident, he states that it was because "it had already been reported by the crew of both trains." Doc. 110 ¶ 30. In his deposition, Davis testified that Craig reported the application of the emergency brakes to the RTC. Doc. 103-1 at 46. He also attests in his declaration that he overheard the crew of Train 1924 calling the incident in, and that he "believe[s] that [RTC] had already contacted [his] train crew" while he was checking on the crew of Train 1924. Doc. 109-3 ¶ 20.[9] Davis also explains in his declaration that the entire train crew, not just the

---

[8] The Incident Report states that, after the crew of Davis' train uncoupled the two trains, "they then rolled the train back a few feet" before "board[ing] Train 1924 to check on the crew." Doc. 103-19 at 2. In another section, the Incident Report states that Train 1924 "experienced 17 ft of movement while stopped with a full-service brake application." *Id.* at 3.

[9] As further discussed below, Davis sought to call the crew of Train 1924 as witnesses at his disciplinary hearing, however, Defendants denied that request. Davis claims that those individuals would have

conductor, is responsible for calling a collision in. *Id.* Moreover, Davis explains that "[o]nce an emergency call goes out over the radio, all radio traffic is to cease so that [RTC] can coordinate a response." *Id.* Therefore, he states, there was nothing for him to call in because it has already been reported. *Id.*

Metro-North considers a collision between trains to be a very significant incident; particularly, it considers "two trains unintentionally mak[ing] contact" to be "the absolute worst case scenario," including because injuries typically result from incidents of that nature. Doc. 104-1 ¶¶ 35, 36.

Paul, Longobardi, and O'Connor each testified that, in their opinion, Davis was attempting to conceal the collision, based on the following: his uncoupling of the trains before investigators or supervision had arrived, his allegedly "attempting to move" the train without authorization, and the fact that he did not immediately call in the emergency. *Id.* ¶¶ 38, 39, 40. Davis states in his declaration: "It is impossible to cover-up a train collision at Metro North because of the robust camera monitoring and record-keeping." Doc. 109-3 ¶ 22. He states that there are cameras everywhere on the train, including in the cab, and that he "looked directly into the camera while decoupling the train"—suggesting that this proves that he was aware of the fact that the collision would be documented and was not attempting to conceal his actions. *Id.* ¶ 18. Davis testified, consistently, that he looked right into the camera while decoupling the trains and that he did not have any intentions of covering anything up. Doc. 103-34 at 71, 72. He also states in his declaration:

> Likewise, there is no way to conceal who crewed the train. There are copious records kept by Metro North. Even if I had sprinted away from the train and hid in the woods after this collision, Metro North would have instantly determined I was the conductor on the train by recourse to crew

---

confirmed that "they called the incident in within Mr. Davis's earshot and that he checked on their condition, eviscerating any claim he intentionally failed to call in the incident in order to conceal it." Doc. 110 ¶ 30; *see also* Doc. 109-4.

assignment records.  The fact I had misplaced my conductor card earlier that day could not possibly be an act of concealment.[10]

Doc. 109-3 ¶ 19.

On the day of the collision, at 3:59 p.m., Metro-North's then-Senior Vice President of Operations circulated a timeline of the collision, which included references to reports made by the crews of each train, and identified as a preliminary cause of the collision that Craig "failed to comply with Restricted Speed due to late/insufficient application of brakes."  Doc. 103-13; *see also* Doc. 104-1 ¶ 41.  This timeline provides that at 1:05 p.m., the "Waterbury Crew" of Metro-North reported the collision, and by 1:16 p.m., Metro-North was in touch with the AMMO train.  Doc. 103-13.  Also on July 12, Davis, Craig, and Santana were removed from service because of the collision.  Doc. 104-1 ¶ 42.[11]  As discussed below, according to a text that Davis' union representative sent him in 2020, Paul told the union on July 12 that they were going to dismiss Davis.  *See* Doc. 111-1 at ECF 4.

The day after the incident, on July 13, 2018, Kelli Coughlin, Deputy Director of Labor Relations at Metro-North, emailed Paul.  Doc. 103-12.  She stated that a video of the incident showed that Davis and his crew "likely attempted to cover up the collision," based on the fact that he, Craig, and Santana uncoupled the two trains, moved their train backwards without authority, and "never radioed for emergency or checked to see if the crew in the train they hit was ok."  *Id.*  Paul forwarded the email to an individual named

---

[10] Davis testified that, if he had known he had dropped his license, he would have called the "chief" to let him know.  Doc. 103-34 at 76.

[11] Davis states that, while he was on unpaid suspension after July 12, he posted a photograph from a boat trip on social media.  Doc. 110 at 2; Doc. 104-1 ¶ 126.  He argues that Defendants "evidently saw [the photo] and considered [it] a 'huge middle finger' to them," based on a text that Davis' union representative allegedly sent him, telling him that Defendants' management were jealous of the photograph.  Doc. 104-1 at 2; *Id.* ¶ 126.  However, Defendants state—and Davis does not contest—that Paul did not learn of Davis' post while he was out of service, and Longobardi did not hear any discussion regarding the boat trip or the social media post prior to Davis' disciplinary hearing.  *Id.* ¶¶ 127, 128.  Defendants also state that "O'Connor is not aware of anyone at Metro-North being offended by Davis posting pictures of himself on a boat or going on boat excursions while he was out of service after July 12," *id.* ¶ 129, and O'Connor testified that, in his opinion, there is nothing wrong with an employee who is out of service going on vacation or a boat ride because "they can do what they want."  *Id.* ¶ 130; Doc. 103-6 at 25.

Alyson Albert, who replied in part, "It does sound like we have three terminations on our hands." Doc. 109-7. Davis points to the fact that, at his disciplinary hearing—which was ultimately held in September 2018—Paul refused to allow the crew from Train 1924 to testify in Davis' defense, because in Paul's opinion, "[h]aving a conversation with the crew of Train #1924 [was] not at all relevant to th[e] inquiry" of "whether Mr. Davis took any action to notify the RTC or supervision of the collision, as required by rule." Doc. 110 ¶ 37 (quoting Doc. 109-4). Davis states: "And yet Mr. Paul testified, and Defendants now maintain, that the motivation for termination was Mr. Davis allegedly engaging in a cover-up, an offense he was never charged with, and for which Mr. Paul denied him the ability to call witnesses to refute." Doc. 110 ¶ 37.

     5.  *Issuance of Disciplinary Charges and Disputes Regarding Pre-Hearing Discussions*

Generally, prior to the issuance of disciplinary charges, Metro-North conducts a factual investigation to determine whether charges should be issued to an employee. *Id.* ¶ 45. Further, the CBA provides:

> No employee will be reprimanded, disciplined, suspended or dismissed from the service until a fair and impartial investigation has been conducted by an authorized Metro-North officer . . . An employee directed to attend an investigation to determine his responsibility, if any, in connection with an act or occurrence will be notified in writing within seven (7) days from the date of the occurrence . . . The investigation must be scheduled to begin within seven (7) days from the date the employee received notice of the investigation . . . The above time limits are subject to the availability for attendance at the hearing of the principal(s) involved and witness(es) and may, by written notice to the employee involved, be extended by the amount of time the principal(s) involved or necessary witness(es) are off duty due to sickness, temporary disability, discipline, leave of absence or vacation.

Doc. 104-1 ¶ 88.

Approximately a week after the collision, on July 19, 2018, Paul wrote in an email that disciplinary charges would be issued against Davis, Santana, and Craig that same day. Doc. 103-15. Paul also remarked, "I saw the video today and it is damning." *Id.*; Doc. 104-1 ¶ 43. Longobardi also showed the video to a union representative. Doc.

104-1 ¶ 44.  In another email on July 19, Paul remarked that Davis and Craig "both have some serious disciplinary marks on their record, so they will likely be terminated" as a penalty for their disciplinary charges stemming from July 12.  Doc. 103-15.[12]  As to Santana, he noted:  "In speaking with [O'Connor], he believes that [Santana's] level of culpability is much less and he will likely receive a suspension only."  *Id.*

A disciplinary hearing was scheduled for July 26, 2018.[13]  Doc. 104-1 ¶¶ 46, 68. Davis was charged with committing four rule violations on July 12:  failing to prevent Craig—the engineer—from operating at an excessive speed, failing to report the collision, participating in an unauthorized reverse move of the train, and failing to carry his conductor certificate.[14]  *Id.* ¶ 46.  As relevant here, Davis was not charged with attempting to cover up the incident.

Rule 26(d)(1) of the CBA provides that, prior to a disciplinary hearing, ACRE "and Metro-North representatives will meet for the purpose of attempting to resolve the matter.  If the parties are unsuccessful at resolving the matter, the trial will proceed." Doc. 104-1 ¶ 53 (quoting Doc. 103-22 at ECF 5).  The parties dispute whether such meeting took place between union representatives and Metro-North.  Defendants state— and Davis disputes—that, "[i]n early August 2018, Davis' union representatives met with representatives from Metro-North to discuss the disciplinary charges that had been issued to Davis and [Craig]" for the July 12 incident.  *Id.* ¶ 56.  They cite to a text message exchange between Davis and his union representative, in which, on August 7, 2018—

---

[12] On January 23, 2012, Craig was assessed a 50-day actual suspension and 11-day deferred suspension, for a total of 61-days, for a July 12, 2011 incident in which he engaged in a verbal argument with an engineer, which escalated into a physical altercation.  Doc. 104-1 ¶ 52.  Davis provides evidence that Craig was additionally suspended for three days in 2014 "for a late start," and formally reprimanded in 2014 "for failure to make a scheduled station stop."  Doc. 109-11 at 2.

[13] As discussed below, the hearing ultimately took place on September 5 and 19, 2018.

[14] Davis states in his declaration that he misplaced his conductor card earlier that day.  Doc. 109-3 ¶ 19.  In his closing remarks at the disciplinary hearing, Davis stated:  "I started the day with my license.  I believe I went to a vending machine or something and bought something.  So maybe that's probably when it slipped out of my pocket.  I turned it in within two to three days . . . So it wasn't permanently lost.  I had it."  Doc. 103-34 at 82.

prior to the adjourned hearing date—Davis asked for an update, and his union representative responded "We will meet with them tomorrow . . . "; then, on August 9, Davis asked "How'd the meeting go?" and his union representative responded "No progress yet[.]  Dennis Richardson is off this week so we will meet again next week to schedule the investigation."  Doc. 103-23 at ECF 2, 4.  At his deposition, Davis was asked whether his union representative's words, "we will meet again," suggest to him that the union representative had already met with Metro-North representatives, and Davis answered, "I assume.  I don't know."  Doc. 103-1 at 61–62.  He testified that he did not recall having any discussions with his union representative by phone or text regarding a purported meeting with Metro-North representatives.  *Id.* at 62.

Defendants also claim—and Davis disputes—that a "meeting," as it is referenced in Rule 26(d)(1) of the CBA, includes "ongoing dialogue between Metro-North and ACRE representatives."  Doc. 104-1 ¶ 55.  Davis denies this representation.  He states, first, that the CBA explicitly requires the representatives to meet.  *Id.* ¶ 54.  Second, he points to Longobardi's deposition testimony that the meeting is an "informal process," whereby the union representative would visit his office—that is, a physical meeting would take place—to discuss the employee.  *Id.* (citing Doc. 103-10 at 38).  Davis states that "[i]t is undisputed that no such meeting occurred" in his case.  Doc. 110 ¶ 54.[15]  However, the parties agree that Paul spoke with ACRE representatives about the July 12 collision in some capacity within a couple of weeks after it occurred.  Doc. 104-1 ¶ 57.

Defendants state that Davis did not want to admit guilt to the disciplinary charges for the events of July 12.  *Id.* ¶ 61.  Davis responds that, as he testified:  "I wasn't guilty, so I don't want to say I am guilty when I am not."  Doc. 110 ¶ 61 (quoting Doc. 103-1 at 80).  Davis was then asked at his deposition:  "If Metro-North had given you a written

---

[15] Defendants state, and Davis does not deny, that "Davis' union representatives did not claim that Metro-North had failed to hold a meeting referenced in Rule 24(d)(1) of the CBA in its appeal of Davis' termination pursuant to the CBA."  Doc. 104-1 ¶ 63.

agreement to resolve your charges that required you to admit guilt to them, you would not have signed the agreement, right?"  Doc. 103-1 at 80.  Mr. Davis responded:  "I don't know."  *Id.*

The parties dispute the extent to which Defendants considered entering into a settlement agreement with Davis.  Defendants state:  "Metro-North would have had an open mind about reaching an agreement to resolve Davis' disciplinary charges . . . prior to [his] disciplinary hearing if Metro-North had received an indication that Davis was taking responsibility for his actions during the July 12, 2018 incident, but it did not receive such an indication."  Doc. 104-1 ¶ 62.  They state that "Davis' union representatives conveyed to Metro-North that Davis thought he was innocent and did not do anything wrong on July 12, 2018 and was not amenable to entering into an agreement in which he would admit guilt to his disciplinary charges[.]"  *Id.* ¶ 58.  Davis denies Defendants' representations that they were open to settling, claiming:  "Paul told [Davis'] union representatives [he] would be terminated the day of the incident, before any facts had been gathered or Mr. Davis made any indication of his view of taking responsibility for the incident in question."  Doc. 110 ¶ 62.[16]  At his deposition, Paul testified that, as of July 19, 2018—as expressed in an email he sent that day—he believed that Davis and Craig would likely be terminated.  Doc. 103-2 at 68.  Davis also points to an August 21, 2018 email that said Davis' case would be moved in "fast track" to a hearing, "with an eye towards termination."  Doc. 103-20.

In disputing how Metro-North approached Davis' case, the parties discuss the settlement that Metro-North reached with Craig; Craig ultimately signed an agreement in August 2018 in which he plead guilty to the disciplinary charges for the events of July 12, accepted a 61-day suspension, and agreed to return to work as an engineer thereafter.

---

[16] Davis testified at his deposition that he "understood" that on the day of the collision, Paul told one of his union representatives that he would be terminated.  Doc. 103-1 at 65.  The record contains a text message that Davis received from one of his union representatives on January 6, 2020, stating that Paul had told him right after the incident that Davis would be dismissed.  *See* Doc. 111-1 at ECF 4.

Doc. 104-1 ¶ 67. Following the issuance of Craig's disciplinary charges, his union representatives conveyed to Metro-North that Craig believed he made a mistake and wanted to enter into a waiver agreement to resolve the charges. *Id.* ¶ 64.[17] At his deposition, Paul compared Craig's and Davis' situations by stating: "Craig . . . through his [u]nion was looking for a resolution of the matter in a way that . . . Davis and [his] [u]nion was not. So his case got settled."[18] Doc. 103-2 at 69. The deposition continued as follows:

> Q: So it is your testimony that Craig Davis, his Union representatives were looking to settle his – the charges against him, but Rhuland Davis' Union representatives were not similarly trying to settle Rhuland Davis' claim?
>
> A: No. I think -- I think both unions were trying to settle. Craig Davis' Union said Craig believes he made a mistake, he wants to waive a hearing, is there a settlement of this matter, and we reached a settlement. Rhuland Davis' Union officials were saying Rhuland Davis thinks he is innocent, he didn't do anything wrong and he is not really amenable to any type of resolution. So we went to a hearing. Someone takes responsibility, another employee doesn't. Their cases are going to be handled sometimes in slightly different ways.
>
> Q: So is it your testimony that Metro-North was open to a settlement with Rhuland Davis prior to the investigation being conducted?
>
> A: I think we would have had an open mind if we were getting any sense from the employee or his Union that they were taking responsibility for their actions, and we were not getting any of those signs.
>
> [ . . . ]
>
> A: That line was not closed. It was always going to be a harder case for Rhuland Davis because he had a very recent termination that turned into

---

[17] In the same August 21 email in which Paul wrote that O'Connor wanted to "go forward with the hearing for . . . Davis with an eye towards termination," he also wrote that, as to Craig, O'Connor was "amenable to a 61 day actual suspension," and that per his discussions with an individual named Matt Mitchell, Mitchell was "agreeable to such terms." Doc. 103-20. Paul then wrote: "Alyson, please work with ACRE, DHI and Transportation to make this happen." *Id.* Based on this email, Defendants state that Craig's "union representative agreed to terms to resolve [Craig's] disciplinary charges for the events of July 12, 2018 prior to the circulation of a written agreement reflecting those terms." Doc. 104-1 ¶ 66. Davis disputes this statement, stating: "Clearly the terms had yet to be agreed-upon or memorialized if they needed to work with the relevant parties to 'make this happen.'" Doc. 110 ¶ 66.

[18] Craig and Davis were represented by the same union. *See, e.g.*, Doc. 103-20 (email from Paul dated August 21, 2018, directing an individual to "work with ACRE" with regards to an agreement with Craig); *see supra* n.17.

> a 61-day suspension of which the arbitrator said he probably should
> have been terminated for that.  So he is coming into this incident in a
> completely different place than Craig Davis who had a fist fight with a
> coworker in 2005 or whenever it was.  Those employees are not like
> situated.

*Id.* 69–70.

It is undisputed that Davis did not ask his union representatives to seek a waiver or settlement offer from Metro-North prior to the start of his disciplinary hearing for the events of July 12, 2018.  Doc. 104-1 ¶ 59.  He also did not ask Metro-North to provide him with a written offer to resolve the disciplinary charges.  *Id.* ¶ 60.  Defendants state that "Metro-North typically only exchanges written offers to resolve disciplinary charges with union officials once the parameters of an acceptable resolution are agreed to in a verbal discussion."  *Id.* ¶ 65.  In his deposition, Paul explained, "waiver offers are only memorialized in writing when there is a deal.  The discussions are usually in person or on the phone, and once . . . the parameters of a deal are reached, then it's executed in writing."  Doc. 103-2 at 100–101.  When asked whether, at any time during his time at Metro-North, Paul was aware of any employee refusing to sign a written waiver agreement that was offered to him, Paul responded, "It could happen sometimes, an employee could get cold feet."  *Id.* at 102.

### 6.  *The Scheduling of Davis' Disciplinary Hearing*

The July 19, 2018 notice of disciplinary charges against Davis scheduled the hearing for Thursday, July 26, 2018.  Doc. 104-1 ¶ 68.  The hearing did not take place on July 26, however there is no explanation on the record as to why.  *See* Doc. 110 at 9.

On August 7, Davis' union representative sent him a text stating that he would not be back in town from vacation for two weeks.  Doc. 104-1 ¶ 69.  He stated that if a resolution to Davis' disciplinary charges could not be negotiated with Metro-North during the next two weeks, a disciplinary hearing would be scheduled after his return, during the week of August 20, 2018.  *Id.*

On August 15, 2018, Davis' disciplinary hearing was rescheduled for August 29. *Id.* ¶ 70. Defendants state that this rescheduling "was in part due to Davis' union representative's time away in August 2018," *id.* ¶ 71; Davis contests this, noting that the initial hearing date of July 26 "had already come and gone by the time of the August 7, 2018 text message relaying that [Davis'] union representative would not be back in town for two weeks." Doc. 110 ¶ 71.

On August 16, 2018, Metro-North's Office of System Safety issued the Incident Report of the July 12 collision, based on a review of video footage, data, and employee statements. Doc. 104-1 ¶ 50; *see* Doc. 103-19. The Incident Report contains a subsection titled "Contributing Factors," which lists, as one of two contributing factors: "Curvature of track at the incident scene caused a line of sight issue." Doc. 103-19 at 3.

In an August 21, 2018 email—which was sent before Davis' investigation was concluded—Paul stated that O'Connor "wants to go forward with the hearing for [] Davis with an eye towards termination. That case should be moved in a fast track to a hearing." Doc. 103-20. The parties take different positions on what to impute to this email. Defendants claim that Paul's statement that O'Connor wanted to "go forward with the hearing for [] Davis with an eye towards termination" "meant that based on the information then known, including Davis' disciplinary history, if the evidence presented at the hearing was as expected the outcome of the hearing could be Davis' termination." Doc. 104-1 ¶ 51. Davis argues that, in their Rule 56.1 Statement, "Defendants have intentionally excised" the second sentence in the email, in which Paul states that the "case should be moved in a fast track to a hearing." Doc. 110 ¶ 51.

When asked at his deposition what he meant by "go[ing] forward . . . with an eye towards termination," Paul stated:

> When you have a case, you can have a preliminary determination in your mind about where you think the case might go if the evidence is what you think it is. But the point of the investigation is to hear the witnesses, hear the testimony, hear if there is some mitigating circumstance that was not

> known. Those things are all prerequisites to a determination. So that's just an honest view on August 21st saying we're going to proceed to a hearing with . . . Davis . . . But he doesn't have a good disciplinary record, so we have a sense of where this case could go.

Doc. 103-2 at 73–74. Then, when asked whether the hearing was actually conducted with an eye towards termination, Paul responded in the negative. *Id.* at 74. He added: "And none of the people in that E-mail conducted the investigation. So my musings to the Labor Relations staff does not impact the Hearing Officer[.]" *Id.* O'Connor was also shown the August 21 email at his deposition, and he was asked: "[I]s it true that you were amenable to a 61-day suspension for . . . Craig . . . but you were not amenable at the time this E-mail was sent to making a deal with Mr. Davis short of termination?" Doc. 103-6 at 19. O'Connor answered, "Correct." *Id.* Then, when asked whether the hearing, when it was ultimately held, was conducted with an eye towards Davis' termination, O'Connor testified: "The hearing was conducted to determine whether or not Mr. Davis was guilty, and if Mr. Davis was found guilty, he would most probably be terminated based on his previous record *and the belief that he had tried to cover up the incident*." *Id.* (emphasis added). O'Connor testified that, prior to Davis' hearing, he had an idea that if Davis was found guilty, his discipline would be termination. *Id.* at 20. Then, when asked whether, prior to the hearing, he was open to the possibility that, while Davis might be found guilty, "there might be mitigating factors that would justify discipline short of termination," O'Connor answered: "Absolutely." *Id.*

In an email dated August 28, 2018, James Walker, a Metro-North hearing officer, told various individuals in Metro-North: "due to the unavailability of a departmental witness (Mr. Pomes) the trial scheduled . . . for Wednesday 8/29, 2018 will have to be rescheduled." Doc. 103-29 at ECF 3. Dennis Richardson, one of Davis' union representatives, responded:

> It is my understanding that Mr. Pomes will be out for several weeks on his honeymoon. This additional time out of service is unnecessary and unjust, Mr. Davis has been out of service for forty eight days already. Please consult with the appropriate people and return Mr. Davis to service pending

a new investigation date.  In addition, [ACRE] is still requesting Engineer [Craig] Davis as a witness at the investigation.  Thank you.

*Id.*  Paul responded, internally, "We should not return him to service but we need to move this hearing along.  Who is Mr. Pomes and is there another official who can take his place?"  *Id.* at ECF 2.

On August 29, 2018, the court reporter for the hearing called out sick, and the hearing was postponed until the following Wednesday.  Doc. 104-1 ¶ 74; Doc. 103-30 at ECF 2.  Prior to August 29, neither Paul nor Longobardi was aware that the disciplinary hearing would not proceed on that date.  Doc. 104-1 ¶ 75.  That day, Paul emailed Jane Murawksi, Director of Departmental Hearings, Investigations and Labor Costing, asking "[w]hat happened today in this regard?"  Doc. 103-30 at ECF 2.  Murawski responded that the court reporter called out sick and they were not able to "provide another one in a timely manner."  *Id.*  She explained that there was not another court reporter available "until after 12:30pm at the earliest," and the "witnesses could not stay . . . and wait," so the hearing had to be rescheduled for Wednesday, September 5.  *Id.*  Davis expresses skepticism over Metro-North's purported need to postpone the hearing, arguing that it "decided to unilaterally cancel the August 29, 2018 hearing because they didn't want to inconvenience their witnesses by making them wait a short time."  Doc. 110 ¶ 76.

The disciplinary hearing was ultimately held on September 5 and 19, 2018.  Doc. 104-1 ¶¶ 77, 87.  Defendants state—and Davis does not dispute—that Metro-North's disciplinary hearings are often rescheduled multiple times, including to permit attendance by necessary parties.  *Id.* ¶ 89.[19]  They also state—and Davis does not dispute—that "[u]nion representatives often request to postpone Metro-North disciplinary hearings,"

---

[19] However, Davis disputes Defendants' statement that "[i]t is typical for Metro-North disciplinary hearings to be conducted well over a month after the issuance of the notice of disciplinary charges."  *Id.* ¶ 90.  Davis responds:  "Defendants have set forth zero admissible evidence for this proposition, and have made no production on the question.  Defendants could have produced other employees' disciplinary hearing rescheduling notices to corroborate this claim, but chose not to, and cannot now rely on totally conclusory, unspecific, self-serving testimony."  Doc. 110 ¶ 90.

and that "ACRE did not claim that the timing of Davis' disciplinary hearing violated the CBA in its appeal of Davis' termination to a neutral arbitrator pursuant to the CBA."[20] *Id.* ¶¶ 91, 92.

### 7. *Davis' Disciplinary Hearing*

Davis' disciplinary hearing commenced on September 5, 2018, and included testimony by two witnesses called by Metro-North. *Id.* ¶ 77. Davis' union representative asked to call Craig as a witness, and Metro-North agreed, however for reasons not provided on the record, Craig did not appear on September 5. *Id.* ¶¶ 78–80. Therefore, the hearing was scheduled to continue on September 11 to permit him to testify. *Id.* ¶ 81; *see generally* Doc. 103-31.

On September 7, 2018, Davis' union representative emailed Metro-North to request that the crew of Train 1924 be made available to testify, stating, "the crew members of train 1924 have relevant testimony related to the incident, especially to the charge of failing to report the incident. Mr. Davis had conversations with the crew immediately after the incident." Doc. 103-39. In the internal correspondence that followed, Paul wrote to other Metro-North individuals: "The question at the hearing is whether Mr. Davis took any action to notify the RTC or supervision of the collision, as required by rule. Having a conversation with the crew of Train #1924 is not at all relevant to that inquiry." *Id.*

---

[20] By contrast, the union did allege that Santana's disciplinary hearing was inordinately delayed. Santana's disciplinary hearing was held on January 14, 2019. Doc. 104-1 ¶ 93. Santana was found guilty and assessed a 15-day actual suspension and 15-day deferred suspension. *Id.* ¶ 94. A neutral arbitrator upheld Santana's discipline. *Id.* ¶ 95; *see* Doc. 103-38. In his decision, the neutral arbitrator acknowledged the argument—but did not make a determination—that Santana's hearing had been inordinately delayed, stating:

> As for [ACRE's] procedural arguments, [Metro-North] urged the Board to discount them as lacking any merit. In that vein, [ACRE] claim[s] that [Metro-North] violated Rule 26(4) by inordinately delaying the investigative hearing, [Metro-North] disputed this contention. It cited the Board to numerous email exchanges between [Metro-North] and [ACRE] and further maintained that there was no demonstration by [ACRE] that [Santana] was prejudiced by any delay or impeded [ACRE's] ability to defend their member.

Doc. 103-38 at 4.

Defendants maintain that the crew's testimony was irrelevant to Davis' disciplinary charges "because Davis was obligated to report the collision by the quickest available means of communication prior to any communication with the crew of the other train." Doc. 104-1 ¶ 102. Davis responds that this is "transparently false," first, because it was not only the conductor's responsibility, but rather the responsibility of the "entire train crew" to call a collision in. Doc. 110 ¶ 102. Second, Davis states that, had the crew been able to testify, they would have confirmed that Davis knew they had reported the incident following the collision, "and therefore [Davis'] failure to call it in himself was not suggestive of deception or a cover-up, since it had already been reported." *Id.*

At Paul's deposition, he testified that Davis' failure to report the incident was part of the reason for the determination that he should be terminated. Doc. 103-2 at 61. The deposition progressed as follows:

> Q: Okay. And does Mr. Davis' failure to have called in the incident inform your view as to whether he attempted to cover up this incident?
>
> A: There is two different parts of his behavior on that day that informed my decision. One, not calling it in, and two, attempting to move the equipment.
>
> Q: Okay.
>
> A: *Both of those things look like an act of concealment*.

*Id.* (emphasis added). Paul then testified that whether or not the crew of Train 1924 reported the incident was "of no consequence," because Davis was "not supposed to rely on the other crew to do anything," but rather had an "independent obligation" to report the incident. *Id.* at 63. A bit later, counsel for Davis questioned Paul about the decision not to allow the crew to testify at Davis' disciplinary hearing. He asked: "You don't believe that [the crew's testimony] could be relevant to mitigation?" *Id.* at 78. Paul responded in the negative, explaining: "Davis had an independent obligation to call in the incident of which he didn't do. So what the crew of 1924 did or didn't do is not relevant. It's a red herring." *Id.* at 78–79. The deposition continued as follows:

Q: Isn't it relevant to whether Mr. Davis' failure to call in an incident was in furtherance of an attempt to cover up the incident?

A: I don't believe Mr. Davis was charged with a coverup. He was charged with failing to call it in, correct?

Q: That's not my question . . . Could you please answer that question?

A: I don't think it's relevant.

Q: I'm not asking whether you think it's relevant. I'm asking whether you think if Mr. Davis knew the other train crew had already called in the incident, that would reflect on whether his failure to call in the incident was part of an effort to cover it up?

A: His obligation is to call it in immediately. He is not going to know instantaneously that the other crew called it in.

Q: I'm not asking – that's not the question I asked. Please answer the question I asked.

[ . . . ]

A: Mr. Davis was not charged with covering up the incident. He was charged with failing to call in the incident. Therefore the company determined that having the crew of 1924 testify about what they did was not relevant to the investigation.

[ . . . ]

Q: Excuse me, Mr. Paul, what you just told me is the determination of whether it was relevant. I didn't ask you whether it was relevant. My question as restated to you now three times is whether Mr. Davis knew the other train crew had already called in the incident, that would reflect on whether his failure to call in the incident was part of an effort to cover up?

A: He wasn't charged with covering it up.

Q: I'm not asking what he was charged. Answer the question posed.

A: I am answering the question.

Q: The question is, doesn't the fact that the – that if the other crew –

A: No.

Q: No, it doesn't? So your answer is no, it has no bearing on whether he was trying to cover it up by not calling in an incident?

A: Because he wasn't charged with concealing the incident.

Q: But you thought that he tried to conceal it, correct?

A: He wasn't charged with concealing the incident.

Q: But you believe he tried to conceal the incident, correct? Please verbalize your answer.

23

> A:  My personal opinion is Mr. Davis' actions indicated that he may have
> attempted to conceal the incident, but that's not what he was charged
> with.

*Id.* at 79–81.

On September 11, 2018, the hearing was again rescheduled to September 19, due to the court reporter's equipment malfunction.  Doc. 104-1 ¶ 82.  Murawski emailed O'Connor, Longobardi, and Paul to inform them that the court reporter could not get his device to work, and that "[e]fforts were made to fix the device issue and to get another court reporter, to no avail."  Doc. 103-36.  Paul responded "???  Is this a joke?"  *Id.*

On September 18, 2018, Paul wrote in an email:  "What is the status of this case?  Ralph Sanzari[21] [sic] is inquiring.  The hearing needs to be held very soon.  Thanks."  Doc. 103-37.  Murawski responded:  "It is going forward tomorrow."  *Id.*

Davis' disciplinary hearing continued—and ultimately concluded—on September 19, 2018.  Doc. 104-1 ¶ 87.  Davis and Craig testified that day,[22] and both Davis and his union representative Richardson delivered closing remarks.  *Id.*  Craig testified that he was controlling the train at the time of the collision, and that while he initially saw the other train coming around a curve, he could not determine at first whether the train was on his track or not.  Doc. 103-34 at 20, 22.  Then, Craig testified, he momentarily got a better line of sight and applied the brakes, but the trains collided.  *Id.* at 20, 21.  Craig was asked:  "Is there anything that . . . Davis, the conductor of this train, could have done to prevent you from failing to . . . operat[e] at a restricted speed?  Is there anything he could have done?"  *Id.* at 21.  Craig answered:  "I would say no.  I was operating at a restricted speed according to the rules.  But at the time of the impact, I guess I wasn't.  But there was no way that he nor the brakeman could have intervened I would say."  *Id.*

---

[21] Ralph Sanziri was Chairman of Davis' union, and one of Davis' union representatives in discussions with Metro-North.  *See* Doc. 58 ¶ 30; Doc. 103-2 at 97.

[22] Another individual, Michael Donnarumma, was called to testify, *see* Doc. 103-34 at 5, however the partial transcript of the September 19 hearing on the record omits most of his testimony, and he is not mentioned in either of the parties' briefs nor Defendants' Rule 56.1 Statement.

at 21–22.  Craig also testified that he was the only one that could see, because based on where Davis and Santana were sitting when the train was "at this particular curve" on the track, they were "on the blind side."  *Id.* at 22.

Davis testified that the engineer physically runs the train, whereas he—Davis— does not have a license to operate it.  *Id.* at 77.  He testified that the first thing he did after the collision was to uncouple the trains.  *Id.* at 44.  When asked whether he directed Craig to move the AMMO train back, he answered in the negative; the hearing officer then asked:  "Then how is it that the AMMO train moved back?"  *Id.*  Davis responded, "That's part of uncoupling."  *Id.*  He testified that the next thing he did was to board Train 1924.  *Id.* at 44–45.  Davis also testified that, when he exited his train, he turned on his handheld radio, at which point he heard a Rail Traffic Controller calling out "emergency; emergency; emergency"; thus, Davis testified, he knew that the incident had been called in.  *Id.* at 70–71.  He also testified that, while on Train 1924, he heard its crew discussing the incident on their radio.  *Id.* at 45, 72–73.

### 8.  *Post-Hearing*

A week after the hearing, on September 26, 2018, Davis' union representative texted him:  "He said he would put you back to work tomorrow IF you sign a last chance waiver for time served, admitting guilt and forfeiting any appeals.  If you decline they are going to dismiss.  Not a great choice but let me know what you want to do.  We support any decision you make.  Thanks."  Doc. 103-40.  Approximately 50 minutes later, the union representative sent an additional text, stating:  "I spoke to Ralph,[23] I sent an email to grant them an extension on their time to make a decision.  Ralph wants to see the President about the offer."  *Id.*  Davis responded "Ok."  *Id.*  At his deposition, Davis was asked whether he understood that if he "accepted this offer, the time between July 12th and September 27th would be considered a suspension and that [he] would be back at

---

[23] The Court presumes that this refers to Ralph Sanziri, Chairman of Davis' union.  *See supra* n.21.

work on last chance discipline[.]" Doc. 103-1 at 73. Davis responded: "That was discussed. I don't know that I knew that it would happen. I never received anything stating that outside of, you know, the text messages." *Id.* at 73–74. Then, Davis was asked whether, upon receiving this text message from his union representative, he understood that Metro-North had made him an offer to resolve the disciplinary charges that he could either accept or reject. *Id.* at 77. Davis initially answered, "I don't remember any conclusion or any further –," then he added, "I believe so. I also believe that was after the hearing." *Id.* at 77–78.

Defendants claim that, on September 26, the day Davis received the text from his union representative, "Metro-North made an offer to Davis' union representative to resolve Davis' disciplinary changes for the events of July 12, 2018 by Davis admitting guilt to his charges, accepting the time he had been held out of service as a suspension, and returning to work as a Conductor." Doc. 104-1 ¶ 107. Davis contests this, stating that the email chain which Defendants cite to evidences only that an offer was discussed, not that it was "ever actually made." Doc. 110 ¶¶ 106, 107. In that email chain, on September 28, 2018, Paul emailed Coughlin asking: "Was there any further discussion yesterday with ACRE about a settlement of this case?" Doc. 103-41. Coughlin replied that day:

> Kevin and John spoke with Ralph about offering Davis to sign a waiver for time served. They have an email from Dennis Richardson extending the time limits for the G-32. As of this morning, they have not heard back from Ralph as to whether Davis has accepted the offer. John Longobardi is going to get back to me as to whether Kevin has heard anything this morning.

*Id.* At his deposition, Paul testified that a waiver was offered to Davis "after the investigation concluded, but before a determination of what discipline would be meted out." Doc. 103-2 at 71.

On October 3, 2018, Paul emailed O'Connor: "I have exchanged some texts with Ralph and Davis will not agree to a waiver for the Bridgeport incident. I think we should

proceed with the termination and can further evaluate at the LR appeal stage. Thoughts?" Doc. 103-42 at ECF 3. O'Connor responded: "I'm ok with that - I know he spoke with JEK yesterday and the union gave us another week to make a decision, I haven't had a chance to speak with John regarding same." *Id.* at ECF 2. Paul replied: "We cannot give them the same deal that was available on a waiver basis. That rewards them for being stubborn." *Id.*

Defendants state, and Davis does not dispute, that a Metro-North employee's "unwillingness to admit fault prior to a disciplinary hearing impacts the severity of the discipline assessed after the hearing," whereas a Metro-North employee's "willingness to admit fault prior to a disciplinary hearing saves Metro-North the cost and business disruption entailed by conducting such a hearing." Doc. 104-1 ¶¶ 113, 114. Defendants claim that "[a]n employee's admission of guilt . . . is a standard term in agreements between Metro-North and employees to resolve disciplinary charges." *Id.* ¶ 116.

On October 9, 2018 Davis was found guilty by a notice of discipline issued by the Metro-North Transportation Department, and terminated effective immediately. Doc. 103-50.

### 9.  Appeal

Davis' termination was appealed to Metro-North's Labor Relations Department, which, in a seven-page opinion letter issued on March 8, 2019, upheld the charges and Davis' termination. Doc. 104-1 ¶ 118; *see generally* Doc. 103-51. Davis' union also consented to presenting his appeal to the neutral arbitrator for the Special Board of Adjustment No. 1182, which in a two-page award issued on December 10, 2019, upheld Davis' termination. Doc. 104-1 ¶¶ 120, 121; *see generally* 103-25.

On October 8, 2019, Davis filed a complaint against Metro-North with the New York State Division of Human Rights ("NYSDHR") and the Equal Employment Opportunity Commission ("EEOC") alleging that Metro-North engaged in unlawful racial discrimination and retaliation by terminating him. *See* Doc. 65-9 at ECF 2. On

December 18, 2019, Metro-North submitted a position statement to the NYSDHR, in response to Davis' complaint. Doc. 103-52. Metro-North argued that Davis "was terminated for violating significant operating rules which resulted in a train collision," and that "following the collision, he failed to immediately report the incident, as per Metro-North's operating Rules, and then participated in an unauthorized reverse move of the equipment, also in violation of Metro-North's rules and procedure." *Id.* at ECF 2.

On January 6, 2020, Davis texted one of his union representatives, Richardson: "I also received [Metro-North's] response to my complaint with human rights. Can you give me some advice on how to respond? I have to respond by tomorrow." Doc. 111-1 at ECF 2. Richardson responded:

> The other two people involved were offered waivers . . . You were never offered a waiver of discipline. They didn't even have a Pre-trial to discuss the case. *In addition, the Vice President of labor relations told Ralph and I as soon as it happened that they were dismissing you. This was before the facts were known and before the investigation.* They did not treat you the same as the other employees involved or as they treat any employee. They prejudged you and never offered a settlement as they did in other cases.

*Id.* at ECF 4 (emphasis added).

The NYSDHR issued a decision on June 24, 2020, finding no probable cause for Davis' allegation. Doc. 65-9. The EEOC adopted the NYSDHR's no-probable-cause determination. Doc. 58 ¶¶ 5, 6.

### 10. Davis' Proffer of Comparators

#### a. Danielle Bonge and Daniel Magro

On December 17, 2014, approximately three-and-a-half years before Davis' train collision at issue in this case, there was a different train collision in which Davis was not involved. In that case, three Metro-North employees—Danielle Bonge, Daniel Hannon, and Daniel Magro—were operating a train, referred to as the "104 Engine," which passed a stop signal and collided with a passenger train. Doc. 104-1 ¶¶ 134–136. Bonge was operating as the engineer, Hannon as brakeman, and Magro as conductor. *Id.* Bonge and

Hannon are both white.[24]  *Id.* ¶ 137.  Following that incident on December 17, Bonge, Hannon, and Magro were removed from service pending an investigation into the collision.  *Id.* ¶ 138.  However, only Bonge and Hannon were issued disciplinary charges, as discussed below.

Defendants state, and Davis does not dispute, that "[w]hen issuing disciplinary charges for a collision, Metro-North takes into account employees' physical location at the time of the incident and who might have been able to take action to prevent the collision, including whether a [c]onductor was not on the leading end of equipment."  *Id.* ¶ 140.

Magro was not in the operating cab of 104 Engine at the time of the collision, *id.* ¶ 139, and Defendants state that, because of his location, Magro was not issued disciplinary charges in connection with the collision.  *Id.* ¶ 141.  Davis disputes this explanation, arguing that he was "fired in the same circumstances [as Magro] of being physically located somewhere he had no view of what was ahead of the track."  Doc. 110 ¶ 141.  He notes that "Defendants have admitted that they take into account employees' physical position in determining whether they could have taken action to prevent the collision," and argues that they attempt to create a meaningless distinction between him and Magro, both conductors, because neither of them, based on their location in the train, could see ahead on the track leading up to their collisions.  *Id.*  Davis says that the purported distinction between him and Magro "is an obvious canard not supported by any of the testimony cited or the [Incident] [R]eport," particularly since, as previously discussed, the Incident Report concerning Davis' collision notes as a "contributing factor" that the "[c]urvature of track at the incident scene caused a line of sight issue." *Id.* (quoting Doc. 103-19 at ECF 4).  Davis also disputes Defendants' contention as to why Magro was not disciplined, suggesting that Defendants contradict themselves by

---

[24] Although Defendants do identify Magro's race, Davis refers to him as white.  *See* Doc. 110 ¶ 131.

"elsewhere stat[ing] conductors are overall responsible for all rule compliance of a train, without regard to their physical location." Doc. 110 ¶ 141.[25]

On December 23, 2014, Hannon and Bonge were issued disciplinary charges. Doc. 104-1 ¶¶ 142, 147. On December 25, Hannon's union representative reported to O'Connor that Hannon would sign a waiver letter accepting a 30-day suspension in connection with the incident. *Id.* ¶ 148; *see* Doc. 103-61. On December 26, an agreement was drafted that allowed Hannon to admit responsibility for the disciplinary charges and accept the 30-day suspension, as well as waive any right to a trial by Metro-North. Doc. 104-1 ¶ 149; *see* Doc. 103-44. Hannon signed the agreement that same day. Doc. 104-1 ¶ 150.

Bonge's December 23, 2014 charges stated: "Failure to perform your duties as required in that . . . while working as an Engineer . . . you failed to control your locomotive in accordance with the signal indication when you passed the ON3 signal in stop position . . . resulting in a collision with rear car of train 725." *Id.* ¶ 142; *see* Doc. 103-57. On December 25, Bonge's union representative also reported to O'Connor that Bonge would sign a waiver letter accepting a 30-day suspension in connection with the December 17 incident. Doc. 104-1 ¶ 143. On December 26, an agreement was drafted for Bonge to admit responsibility for the disciplinary charges and accept the 30-day suspension, as well as waive any right to a trial by Metro-North. *Id.* ¶ 144; *see* Doc. 103-44. Bonge signed the agreement that same day. Doc. 104-1 ¶ 145.

On January 16, 2015, Metro-North issued a "determination not to decertify" Bonge for the December 17 collision. Doc. 109-5. The determination states:

> Based upon the investigation of all data, it was found that there were mitigating factors involved in that Engineer Bonge was operating Engine 104, Long Nose forward within Grand Central Terminal, without a clear preview of the signals or track conditions ahead. Engineer Bonge was

---

[25] As previously discussed, Defendants state—and Davis disputes—that, "[a]s a [c]onductor working on a train, Davis' duties included having charge over the train and all employees working on the train, including overall responsibility for the train's compliance with all safety rules." Doc. 104-1 ¶ 4.

> operating under the established understanding of procedures that the
> conductor was verbally conveying the signals and track conditions ahead.
> *Due to the ON3 signal being out of her line of sight at the time of the
> incident, under CFR 240.307(i)(1) this incident is deemed a non-
> decertifiable event.*  Any disciplinary action assessed by the carrier is
> separate and apart from this determination.

*Id.* (emphasis added).  Davis points to this determination as indicative that "it is the line

of sight rather than location in the cab that creates culpability."  Doc. 110 ¶ 141.

### Bonge's Disciplinary History

Prior to the December 17, 2014 train collision, Bonge had not received formal

discipline from Metro-North,[26] however she was disciplined in December 2014 for an

incident that occurred that same month, disciplined again in 2015, then disciplined in

2019 for an incident that occurred in February of that year.  Doc. 104-1 ¶ 146.  The

disciplinary charges issued in 2015 and 2019 are further discussed below.

### 2015 Disciplinary Charges

On June 30, 2015, Bonge was issued disciplinary charges in connection with

interference with the Locomotive Engineer and Conductor training/certification process,

which related to her provision of copies of two examinations and one set of examination

answers to other employees in November 2011 and September 2012.  Doc. 104-1 ¶ 151.

Bonge was one of a number of Metro-North employees who were criminally indicted[27] in

connection with cheating on examinations for Metro-North engineers and conductors.  *Id.*

¶ 152.[28]

---

[26] Defendants do not define "formal discipline."

[27] They were indicted in 2015.  *See* Doc. 110 at 12; https://abc7ny.com/post/fired-metro-north-workers-
indicted-in-exam-cheating-scandal/815782/.  The record before the Court does not reflect the outcome of
Bonge's criminal case.

[28] The individuals who were implicated in the cheating scandal were not terminated by Metro-North.  *Id.* ¶
153; Doc. 103-2 at 90.  Paul was asked at his deposition whether he was involved in the determination as to
whether those employees would be terminated, and he answered, "Not to a large degree, no."  Doc. 103-2
at 90.  Then, asked if he knew why the decision was made not to seek termination of those employees, Paul
responded:  "I think the determination was made that they were going to be suspended for a long period of
time, and I think some of them had to work in a different craft at a lower rate of pay and that that was the
appropriate resolution for a large group of people."  *Id.*

On August 3, 2016, Bonge signed a waiver agreement with Metro-North in which she pleaded guilty to the disciplinary charges related to the cheating scandal. *Id.* ¶ 155. As part of the agreement, she also agreed to continue to work in a non-safety sensitive position outside of the Transportation Department without back pay until January 2017, at which point she would be permitted to participate in retraining and recertification as an engineer while being paid at the base wage rate for an engineer. *Id.*; *see* Doc. 103-62. The waiver agreement indicated that Bonge's disciplinary record would reflect a 60-day suspension which would only be removed if there were no additional disciplinary violations within four years from the date of her signature on the waiver. *Id.*[29]

### *2019 Disciplinary Charges*

On February 26, 2019, Bonge had a dispute with a passenger. *Id.* ¶ 159. The next day, Paul received an email from Murawski, stating: "Ms. Bonge who was involved in the cheating scandal is caught on video yelling at a passenger last night. She was taken out of service." *Id.* ¶ 156. Paul replied to the message, copying two of his colleagues, and stated "Oh boy. This is bad. It is not going to end well for her." Doc. 103-63 at ECF 3. Paul also forwarded the message to O'Connor, and commented, "This is bad! Very bad. She is on the road out of here." Doc. 103-64.

On March 5, 2019, Bonge was issued disciplinary charges in connection with the February 26 dispute. Doc. 104-1 ¶ 159. On March 7, Murawski inquired whether there was "any kind of waiver offer on the table" for Bonge to resolve her disciplinary charges, or whether Metro-North should have "the hearing to decide what to do about her[.]" Doc. 103-66. Longobardi replied that day: "This will go to trial." *Id.* On March 11, Paul emailed Murawski, copying others, asking for the status of the "Bonge schedule" and noting: "ACRE made a pitch today on her behalf but was told that the case will be

---

[29] Defendants state that "[f]rom June 2015 until January 2017, Bonge was not permitted to work as a Metro-North [e]ngineer," *id.* ¶ 154; however, it is not clear from the record at what point prior to her August 3 waiver Bonge ceased working as an engineer. *See* Doc. 110 ¶ 154.

moving to a hearing and her actions, while perhaps provoked, cannot be tolerated." Doc. 103-63. Bonge was found guilty of the disciplinary charges for the February 26 dispute and her employment was terminated effective April 1, 2019. Doc. 104-1 ¶ 163; *see* Doc. 103-71.

On June 26, 2019, Paul indicated in an email that he had agreed to the material terms of an agreement with Bonge's union representative for her to return to work in a different capacity. Doc. 103-72. On June 28, Bonge and her union representative signed an agreement in which Bonge pleaded guilty to the disciplinary charges, accepted her time out of service as a non-expungable unpaid disciplinary suspension, and agreed to return in a coach cleaner position. Doc. 104-1 ¶ 165. Bonge also consented to being prohibited from working in any safety-sensitive position in the Transportation Department, including as an engineer, or in a customer-facing position. *Id.* Moreover, Bonge agreed that any future proven violation of Metro-North's rules, policies or procedures would result in her dismissal, for which she waived her right to appeal to a neutral arbitrator. *Id.*

### 11. Defendants' Proffer of Comparators

In their Rule 56.1 Statement, Defendants provide examples of other individuals who have been issued disciplinary charges by Metro-North or with whom Metro-North has entered waiver agreements. The examples, which Davis does not dispute, are as follows:

- Conductor Ann Yanez, who is Hispanic, was terminated based on disciplinary charges for the events of June 1, 2018. *Id.* ¶ 174.[30]

- On May 2, 2019 a representative from Metro-North's Labor Relations Department wrote to the union representative for Conductor Brian Golden, who is white, offering to enter into a waiver agreement whereby Golden would accept a formal reprimand to resolve Golden's pending disciplinary charges. *Id.* ¶ 166. The written waiver agreement to resolve Golden's pending

---

[30] Defendants do not provide additional information on the substance of the "events of June 1, 2018."

disciplinary charges was provided to Golden and his union representative on May 9, 2019. *Id.* ¶ 167.[31]

- On July 10, 2020, Conductor Peter Loussedes, who is white, was issued disciplinary charges for an incident on July 5, 2020 when the train on which he was working did not operate at restricted speed as required. *Id.* ¶ 168.

- On July 10, 2020, Conductor Charles Anderson, who is white, was issued disciplinary charges for an incident on July 5, 2020 when the train on which he was working as a Assistant Conductor did not operate at restricted speed as required. *Id.* ¶ 169.

- On August 6, 2020, Conductor Jason Lassiter, who identifies as "other," was issued disciplinary charges for an incident on August 3, 2020 during which he failed to remind the Engineer of the working limits stop sign, which resulted in the train operating into the working limits. *Id.* ¶ 171.

- On October 1, 2020, Conductor Anthony Fahlman, who is white, was issued disciplinary charges for an incident on September 26, 2020 during which he failed to communicate to the Engineer a signal in the stop position, which resulted in the train moving past the signal in a stop position. *Id.* ¶ 170.

- On October 21, 2020, Conductor Stephen Cheung, who is Asian, was issued disciplinary charges for an incident on October 14, 2021 during which he failed to take appropriate action to prevent his train from coming into contact with standing equipment, including ensuring compliance with restricted speed. *Id.* ¶ 172.

- On October 21, 2020, Conductor Matthew Ware, who is white, was issued disciplinary charges for an incident on October 14, 2021 during which he failed to take appropriate action to prevent his train from coming into contact with standing equipment, including ensuring compliance with restricted speed. *Id.* ¶ 173.

- On April 23, 2021, Conductor Joseph Licata, who is white, was terminated for, among other misconduct, making inappropriate, disparaging, and derogatory remarks about Metro-North passengers while working on March 14, 2021. *Id.* ¶ 162.

### B. Procedural History

Davis brought this action *pro se* against Metro-North on January 11, 2021.

Doc. 1. On September 29, 2021, Davis filed a first amended complaint ("FAC").

Doc. 22. Defendants moved to partially dismiss the FAC on October 21, 2021. Doc. 23.

After the motion was fully briefed, Davis retained counsel. Doc. 41. Counsel for Davis

---

[31] Defendants do not provide additional information concerning the purportedly offending conduct.

subsequently indicated to the Court that Davis wished to withdraw his claims under the NYSHRL, as well as his claims under Title VII against the Individual Defendants. Doc. 48.

The Court issued an opinion granting Defendants' motion to partially dismiss the FAC on June 21, 2022 (the "June 2022 Opinion"). Doc. 52. In the June 2022 Opinion, the Court granted Davis limited leave to amend his § 1983 equal protection and procedural due process claims. Doc. 52 at 23.

Davis timely filed a SAC on August 19, 2022. Doc. 58. In the SAC, Davis alleged that he was subjected to race discrimination, in violation of Title VII and the Fourteenth Amendment of the United States Constitution. Doc. 58 ¶¶ 60–68. Under Title VII, Davis alleged that Metro-North discriminated against him because of his race. Doc. 58 ¶¶ 60–62. He further alleged that Defendants violated the Fourteenth Amendment under the selective enforcement doctrine and otherwise deprived him of procedural due process in connection with his termination. *Id.* ¶¶ 63–68. Davis brought his Fourteenth Amendment claims pursuant to 42 U.S.C. § 1983. Additionally, Davis brought Title VII claims based on the July 2018 collision not originally dismissed in the Court's June 2022 Opinion. Doc. 52 at 18–20; Doc. 58 ¶¶ 1, 60-62.

On October 6, 2022, Defendants filed a motion to dismiss the SAC. Doc. 64. In Davis' memorandum of law in opposition to the motion, he asked the Court to convert the Rule 12(b)(6) motion into a motion for summary judgment because Metro-North had recently produced new documents through discovery that were allegedly highly probative. Doc. 74 at 6–7. On June 20, 2023, this Court issued an opinion dismissing with prejudice Davis' claims for failure to state a claim under Rule 12(b)(6) (the "June 2023 Opinion"). Doc. 83. On July 18, 2023, Davis appealed the June 2023 Opinion. Doc. 85.

On April 25, 2024, the Second Circuit affirmed in part, and vacated and remanded in part the June 2023 Opinion. Doc. 87. In particular, it affirmed this Court's dismissal

of Davis's due process claim, but vacated the Court's dismissal of the Title VII and selective enforcement claims and remanded for further proceedings. *Id.* at 6, 7, 9. With regards to Davis' Title VII claim, the Second Circuit found that the SAC sufficiently pled that Bonge was similarly situated to Davis for purposes of pleading circumstances that gave rise to an inference of discrimination, "because, like Davis, Bonge was on a last chance waiver before her involvement in a train collision."[32] *Id.* at 6. On the other hand, the Second Circuit found "that the remaining alleged comparators are not similarly situated to Davis because the SAC fails to plead that they were on last chance waivers or participated in conduct of comparable severity as a train collision." *Id.* As to his selective enforcement claim, the Second Circuit stated that Davis sufficiently pled that Defendants acted with malice toward him; while it remarked that whether Defendants' conduct was driven by an impermissible motivation was a "close call," it found that the SAC contained "sufficient allegations of irregularities in Defendants' treatment of Davis after the collision" to meet the plausibility standard. *Id.* at 7. Specifically, it pointed to the allegations in the SAC that "(1) Defendants did not provide a pre-investigation meeting or a settlement offer to Davis, in violation of [Metro-North's] [CBA] with the union; (2) Defendants indicated prior to the investigation that they intended to terminate Davis for the collision; and (3) Defendants delayed the investigation of Davis." *Id.*

On November 13, 2024, Defendants moved for summary judgment as to all remaining claims. Doc. 101.

## II.    LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford*

---

[32] As discussed below, subsequent discovery showed that Bonge was *not* on "last chance waiver" at the time of the collision.

*Union Free School District*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it might affect the outcome of the litigation under the governing law. *Id.* The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Medical Center*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or speculation. *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996); *see also Ridinger v. Dow Jones and Co.*, 651 F.3d 309, 317 (2d Cir. 2011). To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986)).

## III.    DISCUSSION

### A.    Title VII Employment Discrimination Claims

Davis alleges that Metro-North discriminated against him because of his race.

#### 1.    Legal Standard

Employment discrimination claims under Title VII are analyzed under the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Kovaco v. Rockbestos-Suprenant Cable Corp.*, 834 F.3d

128, 136 (2d Cir. 2016). Under that framework, the plaintiff must first establish a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802.

To establish a *prima facie* case of discrimination under Title VII, Davis must show that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination. *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003). Defendants concede that Davis meets the first and third *prima facie* elements, and they do not contest the second element. Doc. 104 at 11. They argue that, "putting aside the second element, Davis cannot satisfy the fourth"— that the adverse action took place under circumstances giving rise to an inference of discrimination. Doc. 104 at 11. In the absence of an express discriminatory statement, a plaintiff may support an inference of discrimination by demonstrating that similarly situated employees outside of the plaintiff's protected class were treated more favorably. *Norville v. Staten Island University Hospital*, 196 F.3d 89, 95 (2d Cir. 1999).

Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to offer a legitimate, nondiscriminatory reason for its actions. *McDonnell Douglas*, 411 U.S. at 802. If the defendant satisfies its burden, the burden shifts back to the plaintiff to demonstrate that the proffered reason is pretextual. *Id*. at 804. Ultimately, the plaintiff will be required to prove that the defendant acted with discriminatory motivation. *See Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015).

2. *Prima Facie Case*

As discussed, the only *prima facie* element at issue is whether Davis has asserted an inference of discrimination. Davis argues that an inference of discrimination can be drawn from (1) his being treated more harshly than similarly-situated non-Black comparators, namely Bonge and Magro—two white individuals who were involved in a train collision three years prior to his, Doc. 110 at 12–15, and (2) procedural irregularities surrounding his discipline and termination, *id.* at 15–16. The Court finds that a

reasonable jury could draw an inference of discrimination based on the fact that similarly situated employees were treated more favorably than Davis.

The Second Circuit has explained that a plaintiff seeking to meet his initial burden by a showing of disparate treatment must demonstrate that he is "similarly situated in all *material* respects—not in *all* respects," to the individuals with whom he seeks to compare himself. *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001) (emphasis in original) (internal quotation marks and citation omitted). What constitutes "all material respects" varies from case to case, but "must be judged based on [] whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards . . ." *Graham v. Long Island Railroad*, 230 F.3d 34, 40 (2d Cir. 2000). The standard requires "a reasonably close resemblance of the facts and circumstances" and there must be an objectively identifiable basis for comparability. *Id.*; *see also McGuinness*, 263 F.3d at 54 ("[W]here a plaintiff seeks to establish the minimal *prima facie* case by making reference to the disparate treatment of other employees, those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination.").

In addition to identifying similarly situated employees who are subject to the same performance evaluation and discipline standards, a plaintiff must also show that those employees engaged in acts of comparable seriousness but were not punished as severely as plaintiff. *Graham*, 230 F.3d at 40; *see also Carter v. New Venture Gear, Inc.*, 310 F. App'x 454, 457 (2d Cir. 2009) (summary order). A proposed comparator is not similarly situated "in all material respects" unless she engaged in all of the same misconduct as plaintiff, or at least committed the most serious of the infractions for which the plaintiff was subjected to an adverse employment action. *Jenkins v. St. Luke's-Roosevelt Hospital Center*, No. 09 Civ. 12 (RMB) (MHD), 2009 WL 3682458, at *7–8 (S.D.N.Y. Oct. 29, 2009) (comparator was not similarly situated where he did not engage

in "all of the same misconduct" as plaintiff); *see also Tomasino v. Mount Sinai Medical Center and Hospital*, No. 97 Civ. 5252 (TPG), 2003 WL 1193726, at \*14 (S.D.N.Y. Mar. 13, 2003) (comparators were not similarly situated to plaintiff where none committed the most serious of the infractions for which plaintiff was discharged). Further, such employee "must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination." *Kearney v. ABN AMRO, Inc.*, 738 F. Supp. 2d 419, 426 (S.D.N.Y. Sept. 15, 2010) (quoting *McGuinness*, 263 F.3d at 54) (internal quotation marks omitted).

Defendants argue that Davis cannot raise an inference of racial discrimination through a comparator analysis because he "has failed to identify any non-Black comparators who were similarly situated to him in terms of seniority, disciplinary history, misconduct, and unwillingness to accept responsibility who were nevertheless not fired." Doc. 104 at 16. They argue that the circumstances surrounding Bonge's and Magro's discipline for the 2014 train collision, and each of Bonge's subsequent disciplinary instances, were materially different from those surrounding Davis' 2018 collision.

The Court agrees with Defendants to the extent that, as to Bonge, her discipline for the train collision itself is insufficient to render her a comparator. While the Second Circuit held that Bonge was similarly situated to Davis for purposes of drawing a reasonable inference of discrimination, it did so because the complaint alleged that she was on a "last chance waiver" before her involvement in the train collision. Doc. 87 at 6. However, post-discovery, there is no evidence on the record to that effect, and Davis does not now dispute Defendants' statement that Bonge was not on "last chance" discipline at the time of her involvement in the 2014 collision. *See* Docs. 104 at 11, 112 at 3.

Accordingly, the Court does not find Bonge to have been similarly situated to Davis at the time of their train collision incidents.[33]

However, the Court finds that "the overall pattern" of discipline that Bonge received, beginning with her train collision, could lead a reasonably jury to make an inference of discrimination against Davis.  Doc. 110 at 13.  As an initial matter, Bonge was involved in an incident of equal seriousness to Davis' "most serious" infraction—a train collision.  *Cf. Tomasino*, 2003 WL 1193726, at *14 ("None of the comparators mentioned by [plaintiff] committed the most serious of the infractions for which [he] was discharged, *i.e.,* medicating a patient with a controlled substance without a doctor's order.").[34]  And although Bonge was an engineer, not a conductor like Davis, these roles "share[] sufficient employment characteristics" for Davis and Bonge to be considered similarly situated.  *McGuinness*, 263 F.3d at 54 (finding two employees were comparators where they "held positions of roughly equivalent rank (both in the Executive Cabinet).").  Yet, with each of Bonge's successive violations following her train collision, she arguably received less serious discipline than Davis did between his 2016 and 2018 infractions.  After the 2014 collision, Bonge signed a waiver within three days of being issued

---

[33] Defendants elsewhere argue that Metro-North's resolution with Craig following the 2018 train collision undercuts a discriminatory inference, because Craig, who is also Black, was returned to work before a disciplinary hearing after he accepted responsibility for his charges.  Doc. 104 at 18; *see Toussaint v. NY Dialysis Services, Inc.*, 230 F. Supp. 3d 198, 212–13 (S.D.N.Y. 2017) ("A number of cases in the Second Circuit have recognized that a plaintiff alleging race discrimination cannot establish that he was terminated in circumstances giving rise to an inference of discrimination . . . where the similarly situated comparators are of the same protected class."), *aff'd*, 706 F. App'x 44 (2d Cir. 2017) (summary order).  However, there is no evidence that Craig was on "last chance" discipline prior to the train collision; therefore, as with Bonge, the Court does not treat him as a similarly situated comparator based on his discipline for the train collision.

[34] Defendants argue that "Bonge's discipline for the events of December 17, 2014 is not comparable to Davis' discipline for the events of July 12, 2018 because Bonge was not charged with the same misconduct as Davis, including failing to report a collision and participating in an unauthorized reverse move."  Doc. 104 at 12 (citing *Moultrie v. NYS Dep't of Corrections and Community Supervision*, No. 13 Civ. 5138 (NSR), 2015 WL 2151827, at *3 (S.D.N.Y. May 7, 2015) for the proposition that "[l]ess severe punishment for objectively less serious or qualitatively different misconduct does not raise an inference of discrimination.").  However, Bonge—an engineer—was charged with failing to control her train by passing a stop signal, "resulting in a collision" with the rear car of another train, Doc. 103-57, conduct which is arguably of comparable—if not more severe—seriousness as Davis'.

41

disciplinary charges, and she was returned to work without a "last chance" condition. Approximately six months later, in 2015, when she was disciplined for the cheating scandal that led to a criminal indictment, Bonge again signed a waiver and was neither terminated nor put on "last chance" discipline.  In 2019, she was caught on video having a verbal altercation with a customer; that time, Bonge was terminated, however, she was subsequently allowed to return to Metro-North in a coach cleaner position, and "last chance" discipline was imposed for the first time.[35]  Davis, on the other hand, was put on "last chance" discipline after his first disciplinary episode in 2016—for which he was initially terminated, although his termination was converted to a suspension on appeal—and he was terminated following the 2018 train collision.[36]

Defendants argue that "the fact that Bonge was willing to accept responsibility for her disciplinary charges materially distinguishes her from Davis."  Doc. 104 at 16. However, putting aside that Davis believed he was not guilty of the disciplinary charges, the evidence produced in discovery raises a dispute as to whether, but-for Davis not offering to admit culpability, Metro-North would have been open to exploring a potential resolution of his charges—if even to allow him to return to work in a reduced role like Bonge did following her 2019 incident.

Based on a January 6, 2020 text from Davis' union representative, Paul expressed as early as the date of incident that Davis would likely be dismissed because of the

---

[35] The Court infers that Bonge was put on "last chance" discipline based on Defendants' statement that Bonge "agreed that any future proven violation of Metro-North's rules, policies or procedures would result in her dismissal, for which she waived her right to appeal to a neutral arbitrator."  Doc. 104-1 ¶ 165.

[36] Defendants argue that, "[f]ar from raising an inference of racial discrimination, the 'overall pattern' of Bonge's discipline, shows, if anything, that Davis was treated *more favorably* when he was offered the opportunity to return to work as a Conductor despite his significant misconduct approximately a year and a half after returning to work on last chance discipline."  Doc. 112 at 4 (emphasis in original).  However, Bonge was also returned to her role of engineer following her train collision, and it was not until the 2019 incident with a passenger that she was returned to work in a different role; further, that Bonge was not put on "last chance" discipline until after the 2019 incident could itself be interpreted as an indicator of disparate treatment as compared to Davis.

collision.[37]  Then, in an email sent on July 19, the same day that Davis' disciplinary charges were issued, Paul remarked that Davis would "likely be terminated" for the July 12 incident.  Doc. 103-15.  Further, both Paul and O'Connor testified that—in line with Paul's August 21 email—their early assessment of Davis' case was that it would proceed to a hearing and termination.  Doc. 103-2 at 73–74; Doc. 103-6 at 19.  And O'Connor testified that, at the time of that August 21 email, he was "not amenable . . . to making a deal with Mr. Davis short of termination[.]"  Doc. 103-6 at 19.  Based on this record, there is a genuine dispute as to Defendants' contention that "Metro-North would have had an open mind about reaching an agreement to resolve Davis' disciplinary charges . . . prior to [his] disciplinary hearing if Metro-North had received an indication that Davis was taking responsibility for his actions."  Doc. 104-1 ¶ 62.  Therefore, Bonge's acceptance of responsibility does not necessarily distinguish her materially from Davis, and a reasonable jury could find that she was treated more leniently than he was over the course of their respective disciplinary processes.

Moreover, the Court finds that a reasonable jury could find that Davis was similarly situated to Magro[38]—who was not issued any disciplinary charges whatsoever following the 2014 train collision—because neither had a line of vision ahead of their respective trains in the immediate lead-up to the collisions.  While Magro was situated on the opposite end of the train, whereas Davis was in the fireman's seat of the cabin, there is sufficient evidence that Davis was in a "blind spot."  Therefore, the fact that Magro was in a different car is "not so significant as a matter of logic" to render meaningless the

---

[37] Defendants argue that, because these messages were in response to Davis' request for "advice on how to respond" to Metro-North's opinion in the NYSDHR case, they are "akin to attorney argument, which is afforded no weight on summary judgment."  Doc. 112 at 6.  The Court disagrees, as the statement regarding Paul's communication is a factual statement, not an argument or legal opinion.

[38] While the Second Circuit found that any alleged comparators other than Bonge were not similarly situated to Davis, it did so on the basis that the SAC "fail[ed] to plead that they were on last chance waivers or participated in conduct of comparable severity as a train collision."  Doc. 78 at 6.  Magro was indeed involved in a train collision.

drastically different consequences each received—with Magro not being issued any disciplinary charges, and Davis being terminated. *McGuinness*, 263 F.3d at 54.

Therefore, Davis has sufficiently "establish[ed] the minimal *prima facie* case by making reference to the disparate treatment of other employees," outside his protected class, whose situation was "sufficiently similar to [his] to support at least a minimal inference that the difference of treatment may be attributable to discrimination." *Id.*[39]

### 3. Defendants' Allegedly Legitimate, Non-Discriminatory Reasons for Termination

The Court finds that Defendants have met their burden of articulating a legitimate, non-discriminatory reason for Davis' termination. Defendants argue: "Metro-North consistently has explained that Davis' . . . failure to immediately report the collision and his unauthorized reverse move of his train, was improper and suspect and, in light of his disciplinary history, caused his termination." Doc. 104 at 21. They explain that Davis' allegedly "unauthorized reverse move" of the train and his failure to report the collision "raised a concern that Davis was attempting to 'cover up' the collision[.]" *Id.*

At the time of this incident, Davis was on "last chance" discipline, and Defendants argue that, because he was not willing to accept responsibility for his actions, his case proceeded to a disciplinary hearing. *Id.* at 1. They state that, following the disciplinary hearing, Metro-North offered Davis a "return-to-work agreement"; however, Davis did not accept it, and therefore he was terminated. *Id.* Defendants note that a neutral arbitrator upheld Davis' termination, which is "highly probative of the absence of discriminatory intent in that termination." Doc. 104 at 22–23 (quoting *Collins v. New York City Transit Authority*, 305 F.3d 113, 119 (2d Cir. 2022)). Defendants also state— albeit in responding to Davis' selective enforcement claim—that Davis' termination was

---

[39] The Court does not reach Davis' argument that an inference of discrimination can additionally be drawn from procedural irregularities surrounding his discipline and termination.

motivated by legitimate governmental objectives, such as preventing the recurrence of serious rule violations that threaten safety.  Doc. 104 at 24–25.

### 4.  Davis' Evidence of Pretext

Because Defendants have provided a legitimate, non-discriminatory reason for Davis' termination, the burden shifts back to Davis to come forward with evidence that Defendants' proffered reason was pretextual, thus supporting an inference that the real reason for Davis' termination was discriminatory.  The Court finds that Davis presents sufficient evidence for a reasonable factfinder to conclude that Defendants' proffered reason for his termination was pretextual.

First, Davis has sufficiently established that the evidence calls into question Defendants' claim that they did not terminate him based on an attempted "cover-up" of the 2018 train collision.  At base, Davis has raised sufficient evidence that he did not act elusively, including his testimony from his disciplinary hearing, deposition testimony, and declaration, in which he consistently stated that he knew there were cameras surrounding the area of incident as well as "copious records kept by Metro North."  Doc. 109-3 ¶ 19.  Davis has also provided reasoned explanations for why he uncoupled the trains immediately after the incident, and why he did not report the collision himself— because Craig had already reported the application of the emergency brakes to the RTC, and because he overheard the crew of Train 1924 reporting the incident.[40]

Beyond challenging the substantive merits of any alleged "cover-up," Davis raises sufficient evidence to sustain his claim that Defendants, in bad-faith, relied on the "cover-up" theory while also thwarting his ability to defend against it.  It is undisputed that Defendants denied Davis' request to call the crew of Train 1924 to testify at his disciplinary hearing, which Davis argues would have "eviscerate[ed] any claim [that] he

---

[40] Defendants nowhere dispute that Craig reported that the emergency brakes had been applied.  Further, as previously stated, the timeline which the Senior Vice President of Operations circulated on the date of incident noted that the collision was reported at 1:05 p.m., just four minutes after the collision, and that Metro-North was in touch with the AMMO train by at least 1:16 p.m.  See Doc. 103-13.

intentionally failed to call in the incident in order to conceal it," because that crew would have testified that "they called the incident in within Mr. Davis's earshot and that he checked on their condition." Doc. 110 ¶ 30. At his deposition, Paul justified the refusal of Davis' request to have the crew of Train 1924 testify by stating that Davis had an "independent obligation" to report the incident, and therefore, because he was charged only with failing to report it and not with trying to conceal it, any testimony from the crew of Train 1924 would not be relevant. Doc. 103-2 at 63. Paul also testified, however, that Davis' failure to call in the incident was part of the reason for the determination that he should be terminated, and that Paul's personal opinion was that Davis' "may have attempted to conceal the incident." *Id.* at 61, 81. Davis contests the claim that he had an independent obligation to report the incident, explaining that the entire train crew, not just the conductor, is responsible for reporting a collision. In any event, Paul's testimony is inherently contradictory because he attempts to rely on a "cover-up" theory for Davis' termination while also suggesting that, because Davis was not formally charged with concealment, he did not deserve an opportunity to refute it. The refusal to allow Davis to elicit testimony from the crew of Train 1924 is also relevant because O'Connor testified that he would have been open to discipline short of termination were the hearing to show mitigating circumstances, even if Davis were found guilty. Based on these internal contradictions, a reasonable jury could find that Defendants' proffered reason for terminating Davis was pretextual.

Second, Davis has sufficiently raised a dispute as to Defendants' contention that they did not pursue a settlement agreement with him because he maintained that he was innocent. It is unclear to what extent Defendants explored the possibility of a settlement in the first place, because the record provides scant evidence that a pre-investigation meeting actually took place as required by the CBA—beyond a handful of text messages from Davis' union representative, between August 7–9, 2018, in which he states he and

Metro-North will "meet again next week." Doc. 103-23 at ECF 2, 4.[41]  Additionally,

several communications on the record indicate that, at multiple stages in the disciplinary

process, Defendants' working assumption was that Davis would be terminated:  a text

message from Davis' union representative stating that Paul had told him "as soon as [the

incident] happened that they were dismissing [Davis]," Doc. 111-1 at ECF 4, an email

from Paul dated July 19, 2018 stating that Davis would "likely be terminated," Doc. 103-

15, and an August 21, 2018 email from Paul stating that O'Connor wanted to "go

forward" with Davis' hearing "with an eye towards termination" and so the "case should

be moved in a fast track to a hearing."  Doc. 103-20.  Further, as discussed, O'Connor

specifically testified that at the time of the August 21 email, he was not amenable to

making a deal with Davis short of termination.  Doc. 103-6 at 19.  While it is possible

that Defendants would have been more inclined to seek a resolution had Davis expressed

a readiness to admit culpability, the evidence at least raises the question of whether

Defendants would indeed have been amenable to an outcome other than termination.[42]

Therefore, a reasonable jury could find that Defendants' claim that Davis' case proceeded

---

[41] Davis argues that pretext is additionally established because Defendants violated the process required by the CBA.  The Court finds that there is a genuine dispute as to whether a CBA-compliant meeting took place, and as to whether Defendants' failure to hold a disciplinary hearing on the originally scheduled date of July 26, 2018—with no evident justification—violated the CBA's requirement that an investigation "be scheduled to begin" within seven days of being noticed.  Doc. 103-22 at ECF 5; *see* Doc. 110 at 9.  Because the record does not conclusively establish the extent to which Davis' disciplinary process was conducted in accordance with the CBA procedures, however, the Court makes no determination as to whether any such irregularities would support a finding of pretext.

[42] However, it is worth nothing that Paul's July 19 email also stated that Craig would "likely be terminated," Doc. 103-15, and following Bonge's 2019 incident, Paul wrote in an email that it would not "end well for her" and that she was on the "road out of here."  Doc. 103-63 at ECF 3.  Given Craig and Bonge were ultimately reinstated, these communications tend to show that Defendants' early assessments were not necessarily determinative.  Further, Paul testified that his "musings" about the potential outcome of Davis' disciplinary hearing in his August 21 email had no impact on the hearing officer, and that the hearing was not actually conducted with an "eye towards termination."  Doc. 103-2 at 74.

to a hearing because he was not willing to accept responsibility for his actions was pretextual.[43]

### B. Selective Enforcement Claim

Davis alleges that Defendants violated § 1983 by subjecting him to more severe disciplinary measures than comparators, and that they maliciously interfered with his disciplinary proceedings by denying his request to call the crew of Train 1924 as witnesses in his hearing.

#### 1. Legal Standard

To state a viable claim of selective enforcement, a plaintiff must show that (1) he was treated differently from other similarly situated employees and (2) such treatment was motivated by the malicious or bad-faith intent to injure him. *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790 (2d Cir. 2007). Malice-based claims require proof that the disparate treatment was caused by an impermissible motivation. *Bizzaro v. Miranda*, 394 F.3d 82, 87 (2d Cir. 2005). To prove disparate treatment, a plaintiff must show that he and his comparators are similarly situated in all material respects. *Artec Construction and Development Corp. v. City of New York*, No. 15 Civ. 9494 (KPF), 2017 WL 5891817, at *10 (S.D.N.Y. Nov. 28, 2017). Similarly situated does not mean identical, but rather "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases." *Graham*, 230 F.3d at 40. The resemblance test relies on an objective standard. *Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, 815 F. Supp.

---

[43] Davis additionally argues: "Defendants also identify a number of other crew who were disciplined when their trains operated at excess of restricted speed and/or crashed. In doing so, they have inadvertently revealed that Defendants have never fired an employee for the disciplinary charges brought against Mr. Davis. This establishes pretext in-it-of-itself." Doc. 110 at 14. Indeed, while Defendants identify nine individuals who were issued disciplinary charges for various incidents, Doc. 104-1 ¶¶ 161, 162, 168–174, they only state that two of them—a Hispanic conductor and a white conductor—were terminated. *Id.* ¶¶ 162, 174. On the other hand, Defendants argue that "Davis has not introduced any evidence that these Conductors were on last chance discipline" or that their disciplinary charges were similarly severe to Davis'. Doc. 112 at 5. Based on the limited record of how and for what reasons these other individuals were disciplined, the Court does not make a determination as to whether they were similarly situated to Davis or whether their discipline could support a finding of pretext.

2d 679, 696 (S.D.N.Y. 2011). The test is satisfied when a plaintiff provides comparators a prudent person would objectively find to be roughly equivalent with the plaintiff. *Id.* To determine whether the comparator's conduct is comparable to that of a plaintiff, courts look at (1) whether the plaintiff and the alleged comparators were subject to the same workplace standards; and (2) whether the conduct at issue was of comparable seriousness. *Graham*, 230 F.3d at 40.

    *2. Analysis*

    As previously established, the Court finds that Davis was treated differently from Bonge and Magro, and that both were similarly situated employees. The Court additionally finds that a reasonable jury could deem Craig a comparator for purposes of the selective enforcement claim. Craig was involved in the same collision, in a position of control as an engineer, and had a history of "serious disciplinary marks"—in Paul's words—as recently as 2014; and yet, Craig's disciplinary charges were resolved by agreement and he was allowed to return to work as an engineer. While Defendants point to the fact that Craig, unlike Davis, showed a willingness to enter an admission of guilt, as previously discussed, there is sufficient evidence in the record to call into question whether Defendants would have explored a pre-hearing settlement with Davis if he had indicated a willingness to settle.

    As to whether Davis' disparate treatment was caused by an impermissible motivation, the Second Circuit held, in its opinion denying in part this Court's June 2023 Opinion, that the following allegations in the SAC "suggest[ed] that Defendants acted with malice towards Davis": "(1) Defendants did not provide a pre-investigation meeting or a settlement offer to Davis, in violation of [Metro-North's] [CBA] with the union; (2) Defendants indicated prior to the investigation that they intended to terminate Davis for the collision; and (3) Defendants delayed the investigation of Davis." Doc. 87 at 7.

    Overall, the evidence produced in discovery has lent further support to these allegations. First, as previously discussed, there is a genuine dispute as to whether

Metro-North provided a pre-investigation meeting or settlement offer to Davis. CBA Rule 26(d)(1) provides that ACRE "and Metro-North representatives will meet for the purpose of attempting to resolve the matter." Doc. 103-22 at ECF 5. The evidence does not clearly establish whether such a meeting took place, and whether the parties were in fact "unsuccessful at resolving the matter." Defendants argue that a settlement was not pursued because Davis did not want to admit responsibility, and Paul testified: "I think we would have had an open mind if we were getting any sense from [Davis] or his Union that they were taking responsibility for their actions[.]" Doc. 103-2 at 69–70. These statements, without more, do not establish that the parties in fact met, or attempted to settle, before proceeding to a hearing. Second, as previously discussed, various communications in evidence tend to show that Defendants at least assumed, before the investigation was completed,[44] that David would be terminated. Defendants point out that Paul similarly remarked that Craig's and Bonge's cases would likely end in termination, and yet they were both reinstated after agreeing to take responsibility for their charges. Still, these communications, as corroborated by Paul's and O'Connor's testimony, tend to lend further credence to the allegations that Defendants anticipated terminating Davis. Third, as to whether Defendants delayed Davis' investigation, while Defendants have submitted evidence establishing legitimate bases for many of the postponements, no explanation is provided as to why the hearing was not commenced on July 26, as initially scheduled.

Moreover, separate from the allegations that the Second Circuit relied on, this Court finds that Defendants' refusal to allow Davis to call the crew of Train 1924 to

---

[44] Defendants argue, however, that the factual investigation was well underway. They state that, by the time of Paul's July 19 email, Metro-North had already "conducted a factual investigation into the events of July 12, including identifying a preliminary cause of the collision and reviewing onboard video from the incident," and by the time of his August 21 email, additional facts had been gathered and "Davis' union representatives had indicated that Davis was unwilling to accept responsibility for his misconduct." Doc. 104 at 19. Still, based on the communications, Defendants appeared to assume both that Davis would be found guilty, and that he would be terminated as a result.

testify at his disciplinary hearing, while simultaneously accusing him of attempting to "cover up" the collision, could lead a reasonable jury to conclude that Defendants acted with malice. Defendants state that it is undisputed that "Metro-North has rejected requests from employees other than Davis to present witnesses at disciplinary hearings on the grounds of relevance," Doc. 104-1 ¶ 103, and they argue that their denial of Davis' request reflects, at most, "disagreement about the witnesses' relevance," not that "Metro-North's position was in bad faith or discriminatory." Doc. 112 at 8. While Defendants' interpretation is plausible, it is also true that a rational factfinder could find in favor of Davis, and the Court leaves the determination of Defendants' state of mind to a jury. *See Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) ("[S]ummary judgment is ordinarily inappropriate where an individual's intent and state of mind are implicated.").

## IV.    CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is DENIED.

The parties are directed to appear for a conference on October 17, 2025, at 10:30 a.m. in Courtroom 619 of the United States Courthouse, 40 Foley Square, New York, NY 10007.

The Clerk of the Court is respectfully directed to terminate the motion, Doc. 101.


It is SO ORDERED.


Dated:    September 29, 2025
          New York, New York

_____
          EDGARDO RAMOS, U.S.D.J.